STERN v. PAPER et al.

(District Court, D. North Dakota. December 10, 1910.)

*(Syllabus by the Court.)*

1. BANKRUPTCY (§ 54*)—"FAIR VALUATION."

"Fair valuation," in subdivision 15, § 1, of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]), means such a price as a capable and diligent business man could presently obtain for the property after conferring with those accustomed to buy such property.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 54.*

For other definitions, see Words and Phrases, vol. 3, pp. 2650, 2651.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** BANKRUPTCY (§ 166*)—PURCHASE OF BANKRUPT'S PROPERTY—"REASONABLE CAUSE TO BELIEVE."

"Reasonable cause to believe," in section 60b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), covers substantially the same field as "notice," in determining whether a person is a bona fide purchaser of property.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*

For other definitions, see Words and Phrases, vol. 7, pp. 5956, 5957.]

**3.** BANKRUPTCY (§ 166*)—"REASONABLE CAUSE TO BELIEVE."

Facts which would put an intelligent business man upon inquiry constitute "reasonable cause to believe," under section 60b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), if intent to prefer would be discovered by following up the inquiry.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*]

**4.** BANKRUPTCY (§ 166*)—"REASONABLE CAUSE TO BELIEVE."

"Fear" or "suspicion" of a preference constitute "reasonable cause to believe," under section 60b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), if they would incite an intelligent business man to an inquiry which would disclose a preferential intent.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*]

*(Additional Syllabus by Editorial Staff.)*

**5.** BANKRUPTCY (§ 159*)—"CREDITOR."

A guarantor is a "creditor" within the meaning of section 60b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), relating to the giving of preferences to creditors.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 159.*

For other definitions, see Words and Phrases, vol. 2, pp. 1713–1727; vol. 8, pp. 7622, 7623.]

Action by Max Stern, trustee in bankruptcy of Dave Naftalin, against Sam Paper and Abraham Yoffey. Decree for complainant.

Richmond, Jackman & Swanson, for complainant.
Ball, Watson, Young & Lawrence, for defendants.

AMIDON, District Judge. The complainant is the trustee in bankruptcy of Dave Naftalin, and the action is prosecuted by a creditor in his name to recover a preference. Naftalin had been engaged in the clothing business at Fargo since March, 1904, carrying a stock of ready-made clothing, gents' furnishing goods, and boots and shoes. In March, 1907, he gave his note to the First National Bank of that city for a loan of $3,000, payment of which was guaranteed by the defendants. This note was renewed from time to time at 90-day periods. The last renewal occurred on December 13, 1907, and would mature March 13, 1908; $100 had been paid on the principal of the debt. About February 3, 1908, the bankrupt, for the purpose of paying this note, sold and delivered to the defendants out of his stock of merchandise goods whose cost price was $4,400. They were turned in at $3,140. March 24, 1908, Naftalin was adjudged a bankrupt on a voluntary petition, and the plaintiff was afterwards duly elected trustee of his estate. This suit is brought against the defendants to recover the goods or their value.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The case gives rise to three principal questions:

(1) Was the bankrupt insolvent at the time of the transfer?

(2) Were the defendants creditors of the bankrupt?

(3) Did the defendants have reasonable cause to believe that the transfer was intended as a preference?

The evidence establishes the bankrupt's insolvency at the time of the transfer beyond any reasonable doubt. The stock before the transfer inventoried at cost, $13,851. The sale removed from this stock goods of the cost value of $4,400, thus leaving a balance of $9,-451. The stock contained some goods that were three or four years old. Just what proportion of them were of that age the evidence does not disclose. They consisted, according to the testimony, of heavy winter goods. The season of the year for their sale closed with the month of January, and it would have been necessary to carry the greater part of them over until the ensuing winter before they would be in demand. The defendants, when they purchased the goods, discounted the cost price nearly 30 per cent. The stock on hand at the time of the adjudication was appraised at $3,316.05 by three merchants having large experience in such matters. Between the transfer to defendants and the bankruptcy, there was no change in the condition of the goods, and the total sales did not exceed $200. The only property owned by the bankrupt outside of his stock in trade consisted of fixtures and accounts. These accounts had been accruing for four years. Their face value was $2,200. The fixtures at some time had been inventoried at $1,800. The bankrupt testifies that the accounts and fixtures "stood" him at these sums. The appraisers fixed the value of the accounts at $249.38, and the fixtures at $357. The record shows that the trustee, who is a skillful man in such matters, endeavored to dispose of this bankrupt estate at the best price possible, and as the result of his efforts the entire estate was sold on May 11, 1908, for $2,946. It is urged by counsel for the defendants that no confidence can be placed in the appraisement because it is claimed the appraisers valued the goods as a bankrupt stock. That would have been a violation of their duty, and the court cannot assume that they proceeded in that manner. It was their duty to appraise the property at its fair market value. The bankruptcy had nothing to do with the performance of that duty. It was the business of the appraisers simply to look at the several articles belonging to the estate, and determine what they were fairly worth. I am satisfied from the evidence that they followed that course. I am confirmed in this by the testimony of Mr. Stern, who is disinterested and is qualified by many years of experience as a merchant in the same line, to speak of the value of the estate, and he has testified that the valuation of the appraisers represented the fair market value of the property. According· to that valuation, the entire estate was worth $3,922.43, and at a liberal estimate could not have been worth at the time of this transfer to exceed $5,000.

"Fair valuation," within the meaning of subdivision 15 of section 1 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]), means a value that can be made promptly effective by the owner of property "to pay his debts." That is the

language of this liberal statute. It ought not to be enlarged. Such a value excludes, on the one hand, the sacrifice price that would result from an execution or foreclosure sale, and, on the other hand, the retail price that could be realized in the slow process of trade. This latter value should be excluded because it could only be gained by large expense and the many risks of a mercantile venture. "Fair valuation" means such a price as a capable and diligent business man could presently obtain for the property after conferring with those accustomed to buy such property. Such a value will depend upon many circumstances, such as the age and condition of the stock, the season of the year, and the state of trade. Under the evidence in this case I am satisfied that the fair value of Naftalin's property, exclusive of that transferred, could not possibly have exceeded $5,000. His indebtedness then amounted to $10,407.21. This demonstrates his insolvency.

That defendants were "creditors," within the meaning of section 60 of the bankruptcy act, is settled for this circuit by Kobusch v. Hand, 156 Fed. 660, 84 C. C. A. 372, 18 L. R. A. (N. S.) 660, and Huttig Manufacturing Co. v. Edwards, 160 Fed. 619, 87 C. C. A. 521. Not only were the defendants guarantors of the note, but the evidence satisfies me that Mr. Paper was the chief author of the project for the sale of the goods to his firm in order to protect them from their liability upon the note. Counsel for defendants urges that this was an independent transaction, and had no reference to the payment of the note. The facts do not support that contention. Naftalin testifies as follows:

"Q. How did you happen to sell these goods to Paper & Yoffey?

"A. Well, sir, I had a heavy winter stock at the time, and I had lots of bills to pay, and in the meantime I got notice from the First National Bank saying that they would like to have me take up the paper. I went to Mr. Paper, and told him that if I could sell so many goods at a price to raise about 3,100, 3,150 or 3,200 to clean up some of the accounts, because those goods I have got in hand the biggest part of it I cannot use until next fall, and, if I could raise the amount of money to pay off the bank, that would relieve me of paying 10 per cent. interest. So he said he would talk it over with his manager, and maybe they can use the goods; if they can, they will have it. Then he decided finally to buy the goods, and I sold it to him at those figures."

He tried to qualify this testimony later, but I am satisfied that it gives the true origin of the sale of the goods. It was a scheme developed by the defendants and the bankrupt to meet the emergency that arose when the bank demanded the payment of the note. Naftalin had no means with which to meet that crisis. He had already exhausted every resource to raise money to pay pressing claims, and there were still many such claims in the hands of banks and attorneys clamoring for payment. The extraordinary sale was necessary to save the defendants as guarantors, and was devised for that purpose. The theory that it was an expedient hit upon to aid the bankrupt to meet the pressing claims of mercantile creditors breaks down before the evidence. The very day the goods were delivered, and before the inventories were footed up, Naftalin called upon the defendants for $2,950 with which to pay the note at the bank, and clearly stated that purpose to them. At that time there were hundreds of dollars of

creditors' claims in the hands of local collectors pressing for payment. They, however, were all passed by, and the note at the bank paid February 13th, 30 days before its maturity. These facts are inexplicable upon any theory except that the sale was devised to raise funds for the payment of the note.

The sale to defendants worked a preference. Creditors will receive less than 30 cents on the dollar, while the claim at the bank was paid in full. Did defendants have reasonable cause to believe that a preference was intended? Defendant Paper testifies that, after the guaranty of the first note, he visited Naftalin's place of business frequently. He often talked with him about the condition of his business. In the month of December, 1907, and January, 1908, he knew' that Naftalin was hard up. He knew himself, and had been told by other business men, that Naftalin was in bad shape.' He also knew that there were pressing claims in the hands of collectors in Fargo. During the month of January, 1908, the First National Bank received drafts on Naftalin for mercantile creditors aggregating $815.08. One draft of $5 was paid, five were returned on February 8th, and one February 13, 1908. The bank also received on February 8th a draft of $56.40, which was returned in March. In addition the bank also had for collection two notes of John G. Miller & Co., aggregating $600, one for $300, due December 15, 1907, and which was not paid until January 20, 1908, and another note for $300, due January 1, 1908, which was returned unpaid January 31st, so that during January the bank had for collection against Naftalin drafts and past-due notes aggregating more than $1,400, and all were returned unpaid except $335. In addition to these items, claims were in the hands of local attorneys who were pressing Naftalin for payment. Mr. Paper says he knew that there were pressing claims unpaid. He does not specify what these claims were; but in view of his intimate relations with Naftalin, and also with the First National Bank, the inference is justified that he knew in detail what the claims were. The defendants also knew that the season for the sale of such a stock as Naftalin's had closed, and that his stock would have to be carried over until the ensuing year. During the month of January, Naftalin had held an extraordinary sale from which he has realized about $1,600. After this sale his total receipts ran from $3 to $5 a day. Still the record shows he was owing more than $10,000 of mercantile liabilities. He kept books which showed this indebtedness in detail; but at the time of the purchase the defendants scrupulously abstained from examining them or asking for a statement of his indebtedness. We must also consider, in passing upon this branch of the case, the transaction which is charged as a preference. It was extraordinary in its character. The defendants themselves are merchants, and must have known that other creditors would not stand by and permit a large part of Naftalin's stock to be appropriated to a single creditor without immediately pressing their claims to judgment and execution. Such a sale in bulk is declared by chapter 221 of the Laws of North Dakota for 1907 to be presumptively fraudulent, and that statute simply expresses the experience of the business world. Such a transaction would evidence to any business man that Naftalin was in financial ex-

tremity. His credit was gone, his stock depleted, and his sales trifling. In June or July, of 1907, Naftalin prevailed upon a friend by the name of Meyers to exchange checks with him for the sum of $400. He collected his friend's check, but allowed his own to go to protest. Meyers applied to the defendants, and explained the situation to them, and repeatedly urged them to pay the check. They offered him $250 for it. In January, in response to the importunities of Meyers, Naftalin gave him a check for $50, and requested him to go to the defendants and ask them to cash the check, and assure them that he would take it up that week. This the defendants did. The evidence lends strong support to the belief that the notice from the bank to Naftalin to take up his note was prompted by the defendants. The notice was given at an unusual time, some 40 or 50 days before the maturity of the note. The bank certainly did not feel itself insecure as to the loan. It regarded the guaranty of the defendants as good security. This is proved by the fact that, on the very day that the defendants gave their check to Naftalin for $2,950 with which to pay the note, the bank discounted the note of the defendants for the same amount, and the inference is irresistible that this loan was made for the very purpose of furnishing the defendants money with which to pay for the goods. The bank therefore surrendered the note signed by Naftalin, and guaranteed by the defendants, and took a note signed by the defendants alone. The bank had learned of the desperate condition of Naftalin's affairs through the collections which had come to it against him. All these facts suggest strongly that both the defendants and the bank saw that the end of Naftalin's mercantile career was at hand, and called for the payment of the note in order that the defendants might have an opportunity to protect themselves before the crash came. About two weeks after the sale to defendants, a Mr. Tilly, who had been their attorney, was employed by the bankrupt to visit his creditors and try to make a settlement with them on the basis of 20 cents on the dollar. Forty days after the sale Naftalin was adjudged a bankrupt.

In addition to these circumstances, there is the direct testimony of Meyers himself. It is true he had a grievance against the defendants, and is interested as a creditor to have the transfer set aside. Still, a careful reading of his evidence satisfies me that it is substantially true. He testified that he saw certain goods packed up from the Naftalin store some time after Christmas, 1907. Upon inquiring he was told that they were sample goods belonging to a drummer; but he saw these goods hauled with a team belonging to the defendants from the Naftalin store to their store. Thereupon Meyers again demanded the money on his check from the bankrupt. They got into a dispute, whereupon Paper, who was present, promised that if Meyers would come to his office the following morning he would pay him, "provided you keep your mouth shut and do not let on to anybody what you seen." On the following morning Meyers went to get his money. Paper refused to pay, and advised the witness that he was foolish for "not taking stock when I told you to take it." Meyers' testimony continues:

"I says: 'I wouldn't do it. I am scared that the creditors will take it from me back again.' I said: 'I know what you have been doing. You have been taking the goods out of the store all right, and now you refuse to pay me what you promised me.' At that he said, 'Well, we bought that and we got a receipt for it.' "

Meyers further testifies that he wrote a letter to John G. Miller & Co., creditors of Naftalin, stating the fact that these goods were taken, and received in reply a letter from Mr. Jackman, one of their attorneys. This letter he showed to the defendants, and relative to what then occurred he says:

"I showed to Paper and Yoffey that letter. We talked, and Yoffey was very excited, and he shook so his glasses fell from his nose. He got nervous, abused me, and told me to get out of the store. He said that: 'You are a bad man; you are telling on us. You don't keep no secrets; you are telling on us.' I told him that he had been stealing the goods out of us creditors, and he ordered me out of the office. He said, 'If you would keep your mouth shut, you would have your money long ago.' "

Do the circumstances and evidence above narrated show that defendants had reasonable cause to believe that the transfer was intended as a preference? The authorities tell us that section 60 of the bankruptcy act does not, on the one hand, require actual knowledge or actual belief of an intent to prefer (In re Eggert, 102 Fed. 735, 43 C. C. A. 1; In re Virginia Hardwood Mfg. Co. [D. C.] 139 Fed. 209); and, on the other hand, that mere fear or suspicion of a preference will not invalidate a transfer (Powell v. Gate City Bank, 178 Fed. 609, 102 C. C. A. 55). Thus between actual knowledge and actual belief, on the one side, and fear and suspicion, on the other, lies the "reasonable cause to believe" mentioned in the section. This classification, however, is not as helpful in the decision of a concrete case as it appears. Fear and suspicion of insolvency, it they be strong enough, become belief, and the difficulty with the classification is that there are no criteria by which it can be said that one set of facts ought to engender fear or suspicion only, while another set of facts furnish reasonable cause for belief. It is impossible to group the ever-changing facts of business life into hard and fast categories, and say that one category produces fear, another suspicion, and another belief. Again, the rule of negotiable paper that facts which arouse suspicion will not defeat the title of a holder (Hotchkiss v. Bank, 21 Wall. 354, 22 L. Ed. 645; Clark v. Evans, 66 Fed. 263, 13 C. C. A. 433) ought not to be applied to a question of preference because that rule "was framed in order to encourage the free circulation of negotiable paper" (Goodman v. Simonds, 20 How. 343, 356, 15 L. Ed. 934), and has no proper application to transfers of property. "Reasonable cause to believe," under section 60 of the bankruptcy act, covers substantially the same field as "notice" in determining whether a person is a bona fide purchaser of property. Hence, under this statute, "notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop." Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99. But if a party has knowledge of facts which cause him to fear or suspect that a transaction into which he is entering will work a preference, that knowledge as a rule will at least be sufficient

to put him upon an inquiry which if prosecuted would disclose the real character of the transaction. It follows, therefore, in my judgment, that the doctrine that fear or suspicion of a preference is not sufficient to invalidate a transfer must have a restricted application under our present bankruptcy law.

What constitutes "reasonable cause to believe," under this section, is a pure question of fact, and each case is best disposed of by an independent consideration of its own facts. The attempt to apply the doctrine of authority to such questions simply results in exalting a few facts that have been emphasized in the first decision so as to bring the second case within its scope, and overlooking other facts which ought possibly to determine the second case. What the statute requires is that the facts and circumstances known to the purchaser shall be ascertained, and then the question answered whether those facts and circumstances would have caused an intelligent business man to believe that a preference was intended, or would have put such a man upon an inquiry that would have discovered the true character of the transaction.

In the present case I am satisfied that the transfer was an illegal preference upon both the grounds which we have considered: (1) The defendants had reasonable cause to believe that it was intended as a preference. (2) The facts that were known to them put them upon inquiry, and, if they had used the slightest diligence, they could have ascertained every fact that is disclosed in the record on this trial.

The evidence shows that the defendants have disposed of the property. They are, therefore, liable for its value. I find that value to be the price which they paid for it, $3,140. A decree will be entered against them for that amount, with interest thereon at the rate of 7 per cent. from the 13th day of February, 1908, together with the costs of this suit. It would seem that defendants would be entitled as a result of this decree to prove a claim against the estate for the principal of the note, and interest to the time when Naftalin was adjudged a bankrupt