ERNST et al. v. MECHANICS' & METALS NAT. BANK OF NEW YORK.

(District Court, S. D. New York. December 30, 1911.)

1. BANKRUPTCY (§ 166*)—"PREFERENCE"—SECURITY FOR CLEARANCE LOAN—STOCKBROKERS.

The bankrupts being largely interested in a stock pool, in accordance with the custom of brokers dealing on the New York Stock Exchange, obtained a clearance loan of $400,000 from defendant bank on January 19, 1910. The pool having collapsed, and the bank ascertaining that the brokers were in difficulties, the cashier demanded additional securities, which were thereupon deposited, which, with a deposit of $54,048.08, was received just prior to the brokers' suspension. The clearance loan was charged to the brokers' deposit account, which was credited with the amount of the deposit received, whereupon the account was closed, and a loan put through for the debit balance. *Held* that, though the deposit might have reached the bank before the brokers were absolutely insolvent, yet the bank knew of the firm's possible insolvency, and that not only the deposit, but the transfer of the securities, constituted a "preference," recoverable by the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*

For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

2. BANKRUPTCY (§ 303*)—EVIDENCE OF INSOLVENCY—BOOKS OF ACCOUNT.

In an action by a bankrupt's trustee to recover certain securities and a deposit delivered to a bank as a preference, the bankrupts' books were admissible to show whether the bankrupts were insolvent at a particular time.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

3. BANKRUPTCY (§ 164*)—"BANK ACCOUNT"—INDEBTEDNESS TO BANK—"PAYMENT."

Where a bank, to which the bankrupt was largely indebted on the day the bankrupt became insolvent, closed its account and credited the

balance, including a deposit just made, on the bankrupt's indebtedness to it, such deposit amounted to a payment pro tanto of the loan, and not a deposit to the bankrupt's account, since a bank account contemplates the right of the depositor to draw against it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267.; Dec. Dig. § 164.*

For other definitions, see Words and Phrases, vol. 1, p. 689; vol. 6, pp. 5247–5253; vol. 8, p. 7749.]

In Bankruptcy. Action by Irving L. Ernst and others, as trustees in bankruptcy of Dudley T. Humphrey and others, individually and as copartners composing the firm of J. M. Fiske & Co., and the firm of J. M. Fiske & Co., against the Mechanics' & Metals National Bank of City of New York, to recover certain securities as an alleged preference. On report of the special master advising a decree for complainants. Affirmed.

J. M. Fiske & Co., stockbrokers on the New York Stock Exchange, the bankrupts, on January 19, 1910, and for a long time prior thereto, had been customers of and depositors in defendant bank, and dealt with them as their bankers. It is the general custom prevailing on the Exchange that stocks and bonds sold are deliverable on the next business day after the sale; payment being made on delivery. In order to obtain funds to pay for stocks and bonds so purchased, and to pay loans made for stocks purchased on margins, it is the custom of banks in the financial district each day to make a loan to the broker, who was its customer, which is called a "clearance loan," and is made by the bank crediting the broker's deposit account with the amount requested. These loans are made without interest, and are payable at or before the close of business on the day they are made. On January 19, 1910, at about 10 a. m., Fiske & Co. requested of defendant a clearance loan for that day of $400,000, which amount was credited by the bank to the broker's general deposit account, which then had to its credit some $36,239.47. About 12 o'clock Fiske & Co. deposited in defendant bank $54,048.08, so that the total credits to the account on that day amounted to $490,287.55. At the time the loan was made there existed an agreement between Fiske & Co. and the bank that any collateral deposited by Fiske & Co. with the bank for any indebtedness could be held by the bank as collateral for any other liability of the firm, and that the bank should have a lien on any money or property deposited with it for any liability of the firm, present or future, that it should also have the right to call for additional security for any liability, that on failure to furnish such security the debt should immediately mature, and that the bank should have the right to sell any collateral and apply the balance to the payment of the indebtedness. Before 12 o'clock on January 19th the bank certified and subsequently paid checks drawn by Fiske & Co. aggregating $276,679.67, at which time the bank held notes of the firm for $55,000, secured by collateral. Between 11 and 12 o'clock on that day, owing to the collapse of a pool in a certain stock, being operated on the Stock Exchange in which Fiske & Co. were heavily interested, defendant's cashier was informed that it was rumored that Fiske & Co. were in trouble, whereupon the cashier immediately ascertained the amount of money the firm had drawn from the bank on that day, and instructed the paying teller and the certification clerk not to pay or certify any more checks for the firm. He then went to the firm's office, saw one of the members, informed him of the rumors, was given an evasive reply, and, on stating that the firm had made no deposit that day, was informed that a deposit (the $54,048.08 in controversy) was then on the way to the bank. The cashier demanded further securities, which were also given to him, when he returned to the bank. He testified that he was in the firm's office not more than three or four minutes, that he made no inquiry as to the firm's financial condition, and made no examination of the securities

which he received, but took what he could get.  On his return to the bank he ascertained that the deposit of $54,048.08 had been made in the meantime, and directed that the securities be listed and their value ascertained, and the deposit account of the firm balanced and closed.  A debit entry was made to the firm's account of $400,000, the day's clearance loan, and, it being ascertained that the firm's indebtedness to the bank then stood at $242,201.57, he directed that a loan be put through for that amount and the account balanced.  The securities received by the cashier were subsequently sold for $175,647.45, which, together with certain dividends received, made a gross total of receipts by defendant of $175,697.45.  At the time of the delivery of the securities by the bankrupt it was insolvent, and each of the members of the firm was also insolvent, and 40 minutes after the delivery the firm informed the New York Stock Exchange by letter that it was unable to meet its obligations.  It was thereupon suspended, and at about 3:25 p. m. a petition in involuntary bankruptcy was filed, on which the firm and its partners were adjudged bankrupts.

Ralph Wolf, of New York City, for complainants.
Lewis H. Freedman, of New York City, for defendant.

HAND, District Judge (after stating the facts as above).  [1] My opinion in Hotchkiss v. National City Bank, 200 Fed. 287, just handed down, controls as to the main issues, and leaves very little for discussion here, especially in view of the full report of the master. The proof of insolvency was much more than enough.  The price of the Hocking Valley stock had already reached a price below the mark necessary to make the bankrupts insolvent when the transfer occurred, and it never regained that price, and has since almost altogether disappeared.  The values which it had had prior to January 19, 1910, I am satisfied, as a matter of fact, to have been the result of the existence of the pool.  That the stock had any such value, in such quantities as the bankrupts held it, seems a contention unworthy of any serious argument.  As soon as it was sold in such quantities, its value dropped, not because of a temporary flurry, but because upon an open market, where it was not, in the slang of the brokers, "supported" constantly, it could not maintain a value even as high as its lowest figure of the 19th.

[2] The exception to the admissibility of the books is not good. They were not put in evidence to prove the sale and delivery of any securities represented by any item contained in them, nor the loan of any money, but to show whether the bankrupts were solvent or insolvent at a given time.  If they were not admissible for that purpose, no one could be proved insolvent without proving separately every item of liability and every asset by common-law proof.  The law requires nothing of the sort, but allows any one's books in evidence, even if not a privy, to show whether he is insolvent or solvent, upon proof that they are in fact his books, duly kept in his business, for the purpose of showing his financial condition.  Adams v. Bowerman, 109 N. Y. 23, 15 N. E. 874.  The authorities cited by the defendant are all cases where the effort was to use the books to show that an item therein contained in fact represented some transaction which was the basis of the action.

The last question is of the deposit of $54,048.08, received some time about 12 o'clock from the bankrupts.  The exact time when this was

received cannot be fixed, except that it was after Roe left the bank, and before he got back. Moreover, it had left the bankrupts' place of business before Roe got there. As Roe left at between 10 minutes before noon and noon, and as he got to the bankrupts' office in about 5 or 10 minutes, it is almost certain that the deposit reached the bank about 5 minutes before noon, and, therefore, at a time when the bankrupts were solvent. The only remaining question which can arise is whether, when the bank received the money, they knew that the bankrupts were insolvent, because it is not necessary to prove that the bankrupts themselves meant to give any preference when they made the deposits. Alexander v. Redmond, 180 Fed. 92, 103 C. C. A. 446. I agree with the master that the bank never accepted the deposits as such at all, but as a payment of the firm's indebtedness. Roe says that he had at least temporarily closed the account and stopped any further withdrawals.

[3] Now, a bank account certainly means that the depositor may draw, and, if he has no right to draw, his deposit can be honestly received only as a payment of indebtedness already owing. Treating it, therefore, as a payment of the "clearance" loan pro tanto, was the bank's information at that time enough to make it a preference? Roe learned nothing from Sherwood, except in so far as by an evasive answer he corroborated his existing information. I do not mean that this added nothing to Roe's information, for reticence under the circumstances was nearly equivalent to an admission of the fact; but it does not follow that the information was not enough without such an admission. Consider the situation as a whole in the light of all the facts. The bank heard that there was a rumor that the bankrupts were in financial straits, which necessarily meant that they might be insolvent. Until confirmation of the rumor could be made, they had stopped the normal relations between themselves and the bankrupts, conduct which cannot possibly have meant anything else than that they feared the bankrupts' insolvency and meant to act as though it already existed till they should learn the facts. Finally they sent an officer directly to the bankrupts to learn what he could, and to bring back everything he could get, which would secure the indebtedness. Really, it seems to me, in face of such circumstances to contend that the bank did not apprehend that the bankrupts might be then insolvent is beyond serious consideration. Of course, if an intent to receive a preference can exist only when the creditor has full knowledge of insolvency, then there was not the necessary intent here; but full knowledge is not necessary, and practically never exists. As in other cases of notice, as, for example, commercial paper, all that is necessary is such knowledge as would put most men on inquiry. Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; Stern v. Paper (D. C.) 183 Fed. 228. Here the knowledge did in fact stimulate inquiry, and the inquiry showed the rumor to be true. There could be no better case of intent, unless a confession of insolvency be necessary. Therefore I agree with the master that, even if the deposits reached the bank before Roe spoke to Sherwood, the delivery was a preference under the act, and was invalid.

The proof of the custom in the case at bar is a little different from that in the case of Hotchkiss v. National City Bank, in that Roe testifies to one instance in which a bank went to a customer and required him to put up collateral for a loan. The circumstances are too vague, however, to enable me to attach any effect to this testimony.

Let a decree pass as indicated by the master, with costs.