Argued March 14; reversed June 23; rehearing denied
September 29, 1936

## NICOLAI-NEPPACH CO. *v.* SMITH ET AL.

(58 P. (2d) 1016, 60 P. (2d) 979)

452

*Irving Rand* and *Charles W. Erskine*, both of Portland (Fred Gronnert, of Portland, on the brief), for appellants.

*R. R. Rankin*, of Portland (Wood, Matthiessen & Rankin, of Portland, on the brief), for respondent.

BEAN, J. The defense in this action is based upon certain provisions of the Federal Bankruptcy Act, section 67, subd. (f), which provides in part as follows:

"(f). That all levies, judgments, attachments, or other liens, obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of a petition in bankruptcy against him, shall be deemed null and void in case he is adjudged a bankrupt, and the property affected by the levy, judgment, attachment, or other lien shall be deemed wholly discharged and released from the same, and shall pass to the trustee as a part of the estate of the bankrupt, * * *" (U. S. C. A., Title 11, § 107, p. 138.)

This subdivision of section 67 was amended by the act of June 7, 1934, in certain particulars, which need not be mentioned as they do not affect the present action. See Collier on Bankruptcy (13th Ed.) (1935 Supp.) 564.

Plaintiff introduced evidence showing that between the date of the execution of the redelivery bond and the date of the filing of the involuntary petition in bankruptcy, certain personal property covered by plaintiff's attachment had been sold by the Smith & Valley Iron Works Company. Plaintiff at the trial urged that this evidence showed a breach of the redelivery bond and that it was therefore immaterial whether the Smith & Valley Iron Works Company was solvent on the date of the attachment and that it was immaterial whether an involuntary petition in bankruptcy had been filed against said company within four months from the date of the attachment. The trial court passing upon this contention remarked in part as follows:

"* * * but as I view the bankruptcy act, the adjudication in bankruptcy, assuming that at the time that the attachment was levied, the Smith and Valley Iron Works Company was insolvent, that the lien would thereby be destroyed, the same as if it never had at-

tached, and for this reason, if that be true, it is my opinion that the sureties are not liable on the bond. * * *"

Evidence was introduced upon the issue raised in defendant's answer relative to the insolvency of the Smith & Valley Iron Works Company on the date of plaintiff's attachment, January 21, 1932. The jury brought in a verdict in favor of plaintiff and against defendants in the sum of $4,573.66, with interest thereon at 6 per cent per annum from October 5, 1931, and for costs in the original action in the sum of $12, with interest thereon at the rate of 6 per cent per annum from May 21, 1932, and judgment was entered accordingly.

At the close of all the testimony the defendants moved the court for a directed verdict in favor of defendants, which motion the court overruled and which ruling defendants assign as error.

■ Chapter 1, section 1, subd. 15, of the Bankruptcy Act provides that a person is insolvent within the provisions of the Bankruptcy Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts. The term "fair valuation", as used in this section, means the fair market value, or the value that can be made promptly effective by the owner of the property for payment of debts. It means the fair cash value or fair market value of the property as between one who wants to buy and one who wants to sell: *Stern v. Paper*, 183 Fed. 228, 230; *In re Sedalia Farmer's Co-operative Pkg. & Prod. Co.*, 268 Fed. 898; *Mitchell v. Investment Securities Corp.*, (C. C. A.) 67 Fed. (2d) 669, 671.

The question in this case is the solvency or insolvency of the Smith & Valley Iron Works Company on the date of plaintiff's attachment January 21, 1932. See *Stern v. Paper*, supra; *Grandison v. Nat. Bank of Commerce*, (C. C. A.) 231 Fed. 800, 804.

█ Defendants contend that the competent evidence on the part of defendants conclusively shows that on January 21, 1932, the Smith & Valley Iron Works Company was hopelessly insolvent. The plaintiff maintains that the testimony in regard to the insolvency of that company on the date of the attachment, January 21, 1932, is conflicting, and that the question was properly submitted to the jury. The attachment levied on January 21, 1932, was within the four months' period referred to in section 67, subd. (f) of the Bankruptcy Act, as the petition in bankruptcy was filed on May 21, 1932. This we understand is conceded *In re Warner*, 144 Fed. 987. The filing of the petition in bankruptcy fixes the date from which the period of four months preceding is to be calculated and not the date of the subsequent adjudication: *Sullivan v. King*, 31 Tex. Civ. App. 432 (72 S. W. 207, 209). It is not the discharge of the bankrupt but the adjudication of bankruptcy which avoids the lien under section 67, subd. (f) of the Bankruptcy Act: *Leon v. Radford Grocery Co.* (Tex.), 259 S. W. 318, 319; *Casady & Co. v. Hartzell*, 171 Iowa 325 (151 N. W. 97). A forthcoming or redelivery bond for the purpose of obtaining possession of attached property does not discharge the attachment: *Drake v. Sworts*, 24 Or. 198, 202 (33 P. 563); *Dickson v. Back*, 32 Or. 217, 232 (51 P. 727); *Coos Bay R. Co. v. Wieder*, 26 Or. 453, 457 (38 P. 338). When an attachment is levied on the property of a person who is insolvent within four months prior to the filing of a petition in bankruptcy against him and he is afterwards adjudi-

cated a bankrupt, the attachment is null and void, and the avoidance thereof under the Bankruptcy Act releases the sureties on the redelivery bond: *Casady & Co. v. Hartzell,* supra; *Manufacturers Finance Corp. v. Vye-Neill Co.,* 62 Fed. (2d) 625, 627; *Republic Rubber Co. v. Foster,* 95 Conn. 551 (111 Atl. 839); *Trenton Trust Co. v. Carlisle Tire Corp.,* 110 Conn. 125 (147 Atl. 366); *Burkhart v. National Surety Co.,* (Mo.) 252 S. W. 976.

The assets and liabilities of the Smith & Valley Iron Works Company on January 21, 1932, as shown by the testimony produced by the defendants, taking the highest figures mentioned by the witnesses as to the value of the assets, were as follows:

| | |
|---|---:|
| Real estate | $48,332.50 |
| Accounts receivable | 13,285.93 |
| Machinery and tools | 26,000.00 |
| Merchandise on hand | 8,000.00 |
| Office fixtures | 270.00 |
| Truck | 200.00 |
| | $96,088.43 |

The liabilities, as shown by the books and testimony, were $127,065.59, making an excess of liabilities over and above the fair value of the property in the sum of $30,977.16.

Defendants' testimony in regard to the value of the assets of the company was uncontradicted. Plaintiff introduced the testimony of but one witness in regard to the value of the property of the Smith & Valley Iron Works Company. It was contained in the deposition of A. J. Ersted, the receiver in bankruptcy for the Iron Works Company. The deposition of Mr. Ersted was taken in San Francisco and introduced in evidence by plaintiff. At the suggestion of plaintiff Mr.

Ersted attached to his deposition the report he had made July 6, 1932, as receiver to A. M. Cannon, referee in bankruptcy relative to the condition of said Iron Works Company. He made the following statement in his report:

"The business was under the management of Alfred E. Smith for some fifteen or twenty years prior to 1920, since which it has been managed by Walter and Stanley Smith. Records indicate that it was operated very efficiently and profitably for some 30 or 40 years up to and including the year 1919. During the period 1920-31 inclusive, losses, after adjustments, total fully $500,000. During the last five years, in which the company has specialized in building pulp and paper mill machinery, gross sales have averaged $250,000 annually and losses, after adjustment, have averaged about $35,000 annually. Substantial losses are shown for each year of operation since 1919 except the year 1926, when a small profit resulted from sales of over-depreciated capital assets."

After describing the location and construction of the plant, Mr. Ersted states:

"The real property would normally be worth at least $125,000. At present it is held subject to a mortgage of $50,000 to the Smith Hotel Company, with interest at 8 per cent delinquent in the amount of $7,822. In the present market the property probably could not be sold for the amount of the encumbrance. * * * The present value of the plant equipment would normally be at least $75,000. If sold in a lump in the present market it is doubtful if it would bring $15,000 net.

"Merchandise Inventory: The merchandise inventory as listed and priced on the books is valued at $51,000. It consists almost entirely of logging engine and logging block parts manufactured ten or more years ago, and owing to obsolescence would have little more than scrap value today, even if business conditions were normal. If sold in a lump in the present

market it is doubtful if the complete inventory would net over $1,500.''

The report of the receiver was made but a short time after the attachment of plaintiff was levied and corroborates the testimony on the part of defendants. It shows a deplorable financial condition of the Smith & Valley Iron Works Company and indicates a greater degree of insolvency than the testimony on the part of defendants. The insolvency of the company was disclosed by the testimony of Joseph A. Hedeen, who had been employed by the Iron Works Company for about 16 years as bookkeeper and cost accountant. There is no room for controversy in regard to the liabilities of the concern. The quotation from Mr. Ersted's report indicates what a struggle had been made by the Iron Works Company to stem the tide of adversity at the time of the attachment. At the beginning of the year 1932, as indicated by the testimony, the company found itself under a heavy load of indebtedness. Its taxes were unpaid; the interest on its mortgage was delinquent in the sum of $7,822; its bank account was overdrawn; much of its machinery was idle; its credit was gone; its foundry was closed down; its blacksmith shop and pattern shop were about to be closed; its creditors were pressing. The closing down was largely because the concern was losing money for several years, as there was no longer any forge work or blacksmith work in the city of Portland sufficient to justify the operation of the plant.

On the 1st of January, 1932, the Iron Works Company made an inventory of all of its assets, usually taking the cost thereof and deducting for depreciation. The assets were taken at their "book value". The sheriff, when he made the attachment, did not make

an inventory but took the old inventory of January 1, 1932, in order to avoid expense, and the book values went into his return. The same was done in the schedule of assets and liabilities in the bankruptcy proceedings. Mr. Ersted states in his report of July 6, 1932, that he had not taken inventories of either plant equipment or merchandise, as he found among the records of the company a complete inventory of equipment of January 1, 1931, which he satisfied himself was substantially correct and was an inventory of merchandise as of the same date, which was to be adjusted.

Plaintiff is bound by its own testimony given by Mr. Ersted: *Murphy v. Panter*, 62 Or. 522 (125 P. 292); *Hoffman v. Employers' Liability Assurance Corp.*, 146 Or. 66, 82 (29 P. (2d) 557). The rule is laid down in *Ford v. Schall*, 114 Or. 688 (236 P. 745) as follows:

"The evidence may be undisputed, but it is a question for the jury if, as stated in Koontz v. Oregon R. & N. Co., 20 Or. 21 (23 Pac. 820), and cited with approval in Graham v. Coos Bay R. & N. Co., 71 Or. 393 (139 Pac. 337), men of reasonable minds might draw different conclusions from the facts proved. Jurors, however, are not permitted in the face of uncontradicted testimony, to enter the realm of speculation or to indulge in frivolous and captious objections thereto. Only reasonable inferences may be drawn from facts proved."

As stated in 64 C. J. 474, § 444, "Where a party's own evidence discloses facts or matters destructive of his case, the court ought to, and properly may, direct a verdict against such party".

In several instances the figures were given for the value of the property years ago, or the book values made in the annual inventory, which were much greater

than the value of the property on January 21, 1932, and we believe the jury confounded the figures and took the larger figures, which were not shown by competent evidence to be the fair market value of the property on the date in question.

■ In *In re Coddington*, 118 Fed. 281, cited by plaintiff, it was held that in determining the question of insolvency of an alleged bankrupt his credits must be estimated at the actual and not the nominal value where the collectibility is doubtful. So, in the present case, we think that in determining the question of insolvency of the Smith & Valley Iron Works Company the assets should be estimated at their true market value and not their "book value".

■ We realize that it would be almost impossible for the trial court to analyze testimony which, when extended, would cover about three hundred typewritten pages, through which is scattered a vast amount of figures, in the time usually allotted for passing upon a motion for directed verdict. We think the uncontradicted testimony on the part of the defendants and the testimony on the part of plaintiff shows that on the 21st of January, 1932, the Smith & Valley Iron Works Company was hopelessly insolvent, and that the motion for a directed verdict should have been granted.

The trial court instructed the jury to the effect that they could not consider the "book values" of the assets of the Iron Works Company, and sustained objections to the introduction of documents containing the book values of such assets, in so far as the same pertained to the book values. The trial court defined the term "fair valuation" as used in the Bankruptcy Act as follows:

"After you have determined the amount of indebtedness, then you must next find out what the total assets of the Smith and Valley Iron Works were worth, at a fair market value at that time. And, for that purpose, I will tell you what is meant in the law by fair valuation. That term under the bankruptcy act means a fair cash value and it excludes on the one hand sacrifice prices realized upon a forced sale, and on the other hand it excludes retail prices to be realized in the slow process of trade. It means the fair cash value or fair market value of property as between one who wants to buy and one who wants to sell."

The plant of the Iron Works Company is located on Front street in the city of Portland, Oregon. This concern had been in business for a good many years. The main product of the company from 1905 until 1923 was the building of logging machinery. It ceased the manufacture of such machinery in 1923 due to the fact that such equipment went out of use in logging operations, being supplanted by gas engines and diesel tractors. For about five years prior to 1931 the company had specialized in building pulp and paper machinery, at a loss of about $35,000 a year.

The Smith & Valley Iron Works Company, at the time of the attachment, was in a situation similar to that involved in the case of *Mitchell v. Investment Sec. Corp.*, supra, where the court said:

"We think appellant is right. While it is certainly true that, where the bankrupt was a going concern at the date of the transfer, that fact must be taken into consideration in fixing fair values, and scrap or junk values will not do, if the concern, though nominally alive, is in fact dead on its feet, going concern values may not be taken, for a company can have no going concern value unless it is really, and not merely nominally, a going concern. In re Fred D. Jones Co. (C. C. A.) 268 F. 818. We think the statute defining in-

solvency in connection with preferential transfers makes this entirely clear. In effect, it defines it to be a condition of permanent, as opposed to temporary, inability to pay debts. It declares one insolvent when his ability to pay his debts is not temporary through want of ready funds, but permanent through want of convertible assets."

Soon after the attachment, as the testimony indicates, the company convened some of its creditors and strenuously endeavored to make some arrangements so it could reorganize and proceed with business. It was very natural for the officers of the company to make as roseate a showing of the condition as the circumstances would warrant. Statements of that time were not an indicia of the true condition of the concern.

In regard to the accounts receivable of the concern, it was stated by Mr. Ersted, one of plaintiff's witnesses, that:

"The above includes an account against the Weyerhaeuser Company in the amount of $8,764.77 which is in dispute and which the creditor considers to have only a nuisance value of $2,000.00. This account is assigned to the Hibernia Bank and may, however, be considered to fully offset an indebtedness of $5,500 to this Bank, as the Bank is otherwise secured by officers of the company and probably will not file a claim as a creditor. It should not be considered an asset in any other respect, * * *."

We figured the Weyerhaeuser account at the amount which it would liquidate at the bank. However this is figured, it would not change the result.

Mr. Ersted's statement that "the present value of the plant equipment would normally be at least $75,-000" is of no evidentiary value in fixing the "fair valuation" of the equipment on January 21, 1932, as

that term is used in the provisions of the bankruptcy act. Unquestionably, by the use of the word "normally", Mr. Ersted meant if times were normal or good. His explanation shows this plainly.

In *Everett v. Warfield Mining Co.*, 37 Fed. (2d) 328, 329, we read:

"It is clear that the solvency or insolvency of the bankrupt, for the purposes of this case, must be determined as of the time when the alleged preference payment was made; and, in determining this, we must value the assets at what they were reasonably worth at that time, not upon the basis of what they turned out to be worth some time later * * *."

In *Sterns v. Paper*, supra, it is stated that fair valuation within the Bankruptcy Act means a value "that can be made promptly effective by the owner of the property to pay his debts".

Ersted also stated in his report that "If the equipment and inventory is sold off in the present market, general creditors can realize little or nothing. Net proceeds could at best little more than cover preferred claims". Mr. Stanley Smith, general manager of the Smith & Valley Iron Works Company, in referring to the merchandise inventory, testified:

"that the entire inventory of the Iron Works was made during the years from 1921 to 1923, following the close of war activities. The logging industry was, for a short period, on the ascendency. We built some 30 or 40 engines, which went into stock; they were never sold. All the proponent parts went on our stock shelves, largely for the purpose of being able to maintain service for our customers. Within two or three years from the time those machines were built, the value of them practically reduced it into the melting pot, because there was no longer any sales for logging machinery, * * *."

Mr. Smith further stated that if the sale of the merchandise could have been sold over a period of years they might have realized a few thousand dollars more, and "If it had been sold under the hammer, it probably would have brought much less, so I say, as a compromise value, it was worth about $8,000".

Referring to the schedule in bankruptcy of the Smith & Valley Iron Works Company, which was prepared some five or six months after the date of plaintiff's attachment, plaintiff, over defendants' objection, asked Mr. Smith the following questions:

"Q. Did you know that you stated therein that the assets were listed at $342,507.14 and the liabilities at $121,059.99? * * *

"Now, do you remember that you included in the schedule of bankruptcy that you mentioned a merchandise inventory of $51,462.37?"

Although these questions were answered in the negative, the larger figures were apparently in the minds of the jury, and we believe were confused with the fair cash value of the assets.

Plaintiff contends that the testimony submitted by defendants was not conclusive on the jury. We think, by considering the competent evidence, and particularly the figures made as to the different things involved, that there can be but one conclusion. The plaintiff contends that the testimony is conflicting. There is a difference between the testimony of some of the witnesses for plaintiff as to the value of some of the property, and they mention figures somewhat less than we have taken in establishing the status of the Iron Works Company on the date of the attachment, but we find no real conflict in the competent testimony.

Plaintiff construes the testimony of Ersted as valuing the real estate of the concern at $125,000. This,

however, is not the case. We have already referred to the use of the word "normally", in connection with the plant equipment. We do not understand the statement of Mr. Ersted that the real estate was of the fair or market value of $125,000. He mentions the amount of the incumbrance thereon of $57,822, and states that the real estate could not be sold for more than sufficient to satisfy the incumbrance.

It is argued by counsel for plaintiff that much of the testimony in regard to the value of the property was opinion evidence, and the jury was not compelled to believe it. Property such as the machinery in this plant, and the merchandise which had all been used, had no regular established market value, and opinion evidence was the best evidence that could be obtained as to its value. We think the point is not well taken. In 11 R. C. L. 636, § 55, it is stated:

"In no class of cases is opinion testimony more absolutely indispensable than in determining the value of property. It is evident that a court or jury would hardly be able to determine the value of a house, a lot of land, a horse, or any other property, from the most minute description of it. This rule applies to both realty and personalty, provided, of course, it is value as distinguished from cost that is in issue, and provided, further, that the question of value is not conclusively determined by other controlling considerations, * * *. And the value of the use of either real or personal property is also a proper and frequent subject of opinion evidence. Opinion testimony, even that of experts, as to the value, does not differ in principle from the like evidence on other subjects; the opinions are not conclusive, and the jury should weigh them by reference to all the other facts and circumstances in evidence, and judge of their weight and value by their own common sense and general knowledge of the subject."

We find practically the same rule announced in *Paine v. Meier & Frank,* 146 Or. 40, 44 (27 P. (2d) 315, 29 P. (2d) 531), where Mr. Justice BELT, speaking of opinion evidence, states:

"The jury should take into consideration the opinion of such witnesses together with all the other facts and circumstances of the case and accord to it such weight as sound judgment dictates."

Plaintiff cites 22 C. J. 728, § 823, which, as we read it, is to the same effect as above stated. We find an illustration in the note 76 (a), as follows:

"On an application to sell a bankrupt's property free from liens, the court was entitled to credit the sworn estimate of appraisers, and not the uncontradicted opinion of witnesses, that the property would not bring enough to pay the liens." Citing *Clark Hdwe. Co. v. Sauve,* 220 Fed. 102, 136 C. C. A. 194.

 As we understand, where the opinion of competent witnesses is stated as to the value of real estate or personal property and there are no facts and circumstances in the case other than the opinion evidence, then the only thing for the jury to do is to be governed by the opinion evidence. In the present case, instead of there being facts and circumstances contradictory to the opinion evidence, the other facts, especially the report of the receiver Ersted, corroborate the testimony of persons estimating the value of the property.

We are entirely in accord with the ruling announced in *Mitchell v. Southern Pac. Co.,* 105 Or. 310, 318 (209 P. 718), where we find a quotation from *Powder Valley State Bank v. Hudelson,* 74 Or. 191, 194 (144 P. 494), as follows:

"The finding of the jury can not be set aside unless we can say affirmatively that there is no evidence to support the verdict: Article VII, Section 3, of the State Constitution. By 'evidence to support the verdict' is

meant some legal evidence tending to prove every material fact in issue as to which the party in whose favor the verdict was rendered had the burden of proof. * * * If there was any legal evidence to support the verdict, the trial court properly denied the motion for an instructed verdict. In determining this point we have nothing to do with the weight of the evidence. If there was any legal evidence to support the verdict, or to make out the defendant's counterclaim, the question was for the jury, and not for the court.''

The record shows that, after the attached property was released by the giving of the forthcoming bond, the Smith & Valley Iron Works Company manufactured and sold a portion of the attached property of the value of about $2,928.60. Plaintiff contends that on account of the breach of the bond by such sale the sureties are liable to plaintiff on the bond. The attachment debtor, Smith & Valley Iron Works Company, being insolvent at the date of the attachment, and there being an involuntary petition in bankruptcy filed against it, and it being adjudicated a bankrupt, the attachment was null and void and the sureties on the bond were released. The plaintiff was not injured by a failure to return the attached property as it had no attachment on the property when the attachment was null and void. If the property had been returned when demanded, plaintiff's attachment would not then be of any force. We hold that the contention is untenable. Counsel for plaintiff candidly states in his brief that a diligent search has failed to disclose any authority for or against their application in the particular case of a forthcoming bond where sales of property breach the bond before the lien was dissolved by bankruptcy. They cite *Dickson v. Back,* supra. The facts in that case are so varied from those in the instant case that we are unable to apply it on this point.

*Kaminsky v. Harrigan*, 2 Ga. App. 332 (58 S. E. 497), and *U. S. F. & G. Co. v. Murphy*, 4 Ga. App. 13 (60 S. E. 831), are two cases in which the actual sales occurred after the inception of the lien and before adjudication in bankruptcy, but these are distinguishable from the case at bar because the bankruptcy did not occur within the four-month period.

We are not unmindful of the constitutional provision to the effect that no verdict should be set aside if there is any competent evidence to support the same. We are firmly convinced that in the present case the testimony does not support the verdict or judgment and that there is no competent evidence in the record to support such a verdict.

We have given the matter our best thought and consideration and can not arrive at any other conclusion than that the motion for a directed verdict in favor of defendants should have been granted; that for plaintiff to have the benefit of the attachment which was levied would be giving it an illegal preference, and that the property that was attached should be distributed among all of the creditors of the Smith & Valley Iron Works Company. It follows that the judgment of the circuit court must be reversed and the cause remanded with directions to enter a judgment in favor of the defendants.

It is so ordered.

BELT, KELLY and BAILEY, JJ., concur.

---

Petition for rehearing denied September 29, 1936

ON PETITION FOR REHEARING
(60 P. (2d) 979)

BEAN, J. Counsel for plaintiff has filed a petition for rehearing in this case and urges further consideration. As shown from the memorandum opinion, the

question involved is the solvency or insolvency of the Smith & Valley Iron Works Company on the date of plaintiff's attachment, January 21, 1932.

13. Plaintiff for the first time has submitted figures of the assets and liabilities of the Smith & Valley Iron Works Company and struck a balance on the date mentioned. At page 18 of plaintiff's brief on petition for rehearing we find the following figures:

Assets:

| | |
|---|---|
| Accounts Receivable | $ 17,182.87 |
| Inventories | 58,155.04 |
| Real Estate | 48,332.50 |
| Machinery and Tools | 26,295.00 |
| Office Fixtures | 750.00 |
| Truck | 200.00 |
| Total | 150,915.41 |
| Liabilities | 127,065.59 |

Conclusion:

| | |
|---|---|
| Value of assets over liabilities under defendants' own testimony | 23,849.82 |
| Net amount of assets over liabilities | 29,855.42 |

The figures we made of the assets and liabilities of the Smith & Valley Iron Works Company on January 21, 1932, in our former memorandum, are as follows:

| | |
|---|---|
| Real estate | $ 48,332.50 |
| Accounts receivable | 13,285.93 |
| Machinery and tools | 26,000.00 |
| Merchandise on hand | 8,000.00 |
| Office fixtures | 270.00 |
| Truck | 200.00 |
| | $ 96,088.43 |

The first difference in figures, taking them in the order that plaintiff has them, is accounts receivable, which, on the face of the books, is $17,182.87. Part of this is an account against the Weyerhaeuser Company

amounting to $8,764.77, which was disputed. We figured the Weyerhaeuser account at the amount which it would liquidate at the bank. As found in the testimony of Mr. A. J. Ersted, plaintiff's witness, this account "the creditor considers to have only a nuisance value of $2,000". This account was assigned to the Hibernia Bank and was considered to fully offset an indebtedness of $5,500 to that bank, reducing the account $3,264.77, which we deducted. It is also shown beyond dispute that the Spaulding account of $632.17 is valueless, which we deducted, leaving as the amount of the accounts receivable $13,285.93. Counsel for plaintiff is pleased to state that he does not know how we get this figure.

The next item, as stated by plaintiff, is inventories, $58,155.04. This item involves the main contention in this case. On January 1, 1932, the Smith & Valley Iron Works Company, following its custom which had prevailed for years, made an inventory of the "book values" of the merchandise, and the trial court ruled out the testimony in regard to "book values". The inventory was adopted by the sheriff in making his return on the attachment. He made no new inventory and these values went into all of the inventories made later. After the same had been ruled against by the trial court the attention of the jury was called to the same by asking the witnesses if they knew that certain figures were contained in the instruments, which contained simply the "book value" of this property. Changing the form of the inventory and inserting the same values in the sheriff's return and other documents would not validate the testimony. They still would be "book values". The testimony of Mr. A. J. Ersted, taken by plaintiff by deposition in California, in regard to the merchandise inventory is as follows:

"Merchandise Inventory: The merchandise inventory as listed and priced on the books is valued at $51,000. It consists almost entirely of logging engine and logging block parts manufactured ten or more years ago, and owing to obsolescence would have little more than scrap value today, even if business conditions were normal. If sold in a lump in the present market it is doubtful if the complete inventory would net over $1,500."

While this is plaintiff's own testimony, in view of the fact that there was other testimony showing that the merchandise was of the value of $8,000 (see page 225 of the transcript of testimony), which is the highest figure that is mentioned in any competent evidence in the case, we took the latter figure. Counsel for plaintiff does not plainly contend that "book value" is competent evidence of the value of the merchandise on January 21, 1932, but as such values are contained in the inventories, to which we have referred, it is contended that the inventories should govern.

The testimony in the case does not show that the merchandise of the Smith & Valley Iron Works Company on January 21, 1932, was of the value of $58,155.04 placed thereon by plaintiff, or any more than $8,000, if it was of that value. Plaintiff would have little room to complain if we took the testimony of its own witness to the effect that the merchandise would not bring more than $1,500. It would be illegal, inequitable and unfair, and contrary to the trial court's ruling and the testimony in the case, to place the value of the merchandise at the figure contended for by plaintiff, and the contention must be denied. In the testimony of Joseph A. Hedeen, the bookkeeper, on page 72 of the transcript of testimony, it is shown how the inventory was prepared:

"Q. How did you prepare it? Tell the jury what you did in preparing this inventory.

A. It is a book statement of all the assets and liabilities, a book value, and from that I prepared this statement, showing the different items owing and also the book value of the merchandise that we had in the stock.

Q. Where did you get the book value of that merchandise?

A. That is—it was not perpetual, but it was an inventory that we kept right along, showing the costs to the company, of making these different articles that they—

Q. If I understand you, then, you took these items in this inventory from that inventory that you had already prepared?

A. Yes, at the first of the year.

Q. That was only a few days prior, then?

A. Yes."

There seems to be no controversy in regard to the next item, value of real estate, fixed at $48,332.50.

At page 38 of plaintiff's brief on petition for rehearing, plaintiff takes a portion of the following statement, which is found in our former opinion:

"As we understand, where the opinion of competent witnesses is stated as to the value of real estate or personal property and there are no facts and circumstances in the case other than the opinion evidence, then the only thing for the jury to do is to be governed by the opinion evidence."

Counsel quotes and criticizes the last part of the sentence beginning "the only thing for the jury", etc. The matter was fully explained in a prior statement in the original opinion as follows:

"It is argued by counsel for plaintiff that much of the testimony in regard to the value of the property was opinion evidence, and the jury was not compelled to believe it. Property such as the machinery in this plant,

and the merchandise which had all been used, had no regular established market value, and opinion evidence was the best evidence that could be obtained as to its value." Citing 11 R. C. L. 636, § 55.

In regard to the value of the machinery and tools which plaintiff places at $26,295 on pages 146 and 147 of the transcript of testimony, Mr. Kull, who estimated the value of the property, placed the figures at $26,000, while plaintiff contends that if it had been taken as itemized the appraisement would be $295 more. As is often done the round number was taken by us. However, adding the various items of appraisement, this difference in the figure would not be material or change the result.

The office fixtures of the concern were valued at $750. We do not think there is any controversy or dispute about this amount. In our summing up these figures we erroneously placed it at $270, which was a clerical error on the part of the writer, the amount being taken from the notes of the testimony. The truck valued at $200 is not disputed.

Making the corrections suggested by plaintiff, we add to our total assets of $96,088.43, $775, making $96,863.43, as the total amount of assets of the Smith & Valley Iron Works Company on January 21, 1932. The liabilities, as shown by the books and testimony, are $127,065.59, making an excess of liabilities over and above the fair value of the property in the sum of $30,202.16. There is practically no controversy about the liabilities of the concern.

The competent testimony in the case does not show that the assets are of any greater value than we have given. For about four years the concern had been losing

$35,000 annually, and the whole testimony strongly shows they were hopelessly insolvent on January 21, 1932. Any other finding would be a travesty upon justice, and the verdict of the jury should be set aside.

We adhere to our former opinion.

BELT, KELLY and BAILEY, JJ., concur.