MOUNT HOPE CEMETERY ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 76039, 76640.   Promulgated April 14, 1938.

*Benjamin M. Price, Esq.,* and *Ferris E. Hurd, Esq.,* for the petitioner.

*Willis R. Lansford, Esq.,* and *E. L. Weber, Esq.,* for the respondent.

674

OPINION.

MURDOCK: The petitioner in 1930 received $58,001.50 and in 1931 received $48,883.23 from persons to whom it sold burial space in its cemetery. Those amounts are not in dispute. The petitioner now seeks to reduce those amounts by $30,095.76 for 1930 and by $27,338.01 for 1931, as the fair market value on March 1, 1913, of the lots sold in the two taxable years. It claimed smaller amounts on its returns—$15,157.38 for 1930 and $13,721.45 for 1931. The Commissioner in determining the deficiencies allowed even smaller. reductions—$7,635.56 for 1930 and $4,346.08 for 1931. He does not state in his lengthy brief just what values he thinks the evidence establishes, but his contention is that the evidence does not justify the use of any larger reductions than those which he has allowed in determining the deficiencies. We have found as a fact that the proper amounts to be used as a basis in reducing the amount realized in these years are $8,500 for 1930 and $7,000 for 1931.

The respondent has cited a number of cases which hold that a cemetery company does not dispose of the fee simple title to its land and the purchaser of a lot does not acquire a fee simple title, but merely a license or easement to use the land for burial purposes. However, it is apparent that the purchaser of a cemetery lot acquires a property right in the lot which the law recognizes, which can pass to his heirs or representatives at his death, and which may be enjoyed as long as the ground continues to be used as a cemetery. *People ex rel Paxton* v. *Bloomington Cemetery Association*, 353 Ill. 534; 187 N. E. 455; *Brown* v. *Hill*, 284 Ill. 286; *McWhirter* v. *Newell*, 200 Ill. 583; *Mount Hope Cemetery Association* v. *New Mount Hope Cemetery Association*, 246 Ill. 416; *Community Mausoleum Co.*, 33 B. T. A. 19. The respondent agrees that the amount which the petitioner received during the taxable years may be reduced by a basis in order to determine the portion of it that represents taxable income, even though the fee was not sold. Cf. *International Cigar Machinery Co.*, 36 B. T. A. 124; *William Robert Farmer*, 1 B. T. A. 711. Neither party has presented any argument showing that the basis should be different from that part of the fair market value on March 1, 1913, of the unsold land itself, which is allocable to the lots sold in the taxable years.

Section 113 (b) of the Revenue Act of 1928, which is controlling here, provides that the basis for gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be the cost of such property or its fair market value as of March 1, 1913, whichever is greater. The purpose of Congress was to permit a taxpayer to recover its capital investment on the basic date tax-free before taxing the gains. Cf. *United States* v. *Ludey*, 274 U. S. 295. The petitioner in 1930 and 1931 sold burial space in its cemetery which was a part of the land owned and held by it for such use on March 1, 1913. The only property involved in those profitable transactions which had any basis for gain or loss was the land. The petitioner's basis for gain or loss upon the disposition of that remaining burial space in its cemetery was the cost of that land or its fair market value on March 1, 1913, whichever was greater. The cost would include any improvements made up to March 1, 1913. The fair market value on March 1, 1913, was greater than cost, consequently the basis which the petitioner is entitled to deduct before any excess realized from the disposition of lots is subject to tax, is the fair market value of the land on March 1, 1913.

The land involved in the transactions of 1930 and 1931 was a part of the whole area which the petitioner owned on March 1, 1913. This fact must be kept in mind in determining the basis applicable to the space sold in the taxable years because the value of and the basis for the space sold in each year was a part of the value of the larger area. Cf. *Reinecke* v. *Spalding*, 280 U. S. 227. In other words, the total basis which the petitioner was entitled to recover from the disposition of its burial space after March 1, 1913, was the same amount regardless of whether it should sell the entire space in one transaction or whether it should sell a few lots each year for a great many years. The sum of the bases for the space sold in the various years, after the entire area is sold, should exactly equal the value of the whole area as of March 1, 1913. That is, the sum of the bases for all of the separate burial spaces can not, under the circumstances of this case, exceed the fair market value on March 1, 1913, of all of the available burial space in the cemetery at that date considered as a whole. Cf. *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312; *James Couzens*, 11 B. T. A. 1040, 1161. Therefore, the result should be the same whether the basis applicable to the space sold in the taxable years be determined directly or whether the value of the whole be first determined and a proper portion thereof allocated to the space sold in these years. Cf. *Trustees of New York and Brooklyn Bridge* v. *Clark*, 137 N. Y. 95, 32 N. E. 1054.

No attempt will be made to state any precise rule to be used to the exclusion of all others in determining value. The inquiry should be as broad as possible so that no important element or factor may

be disregarded. Consideration should be given to all pertinent information available. The record in this case includes the opinions of three witnesses as to values—one for the petitioner and two for the Government. It also contains many facts and figures relevant to the question involved. It is our duty to determine a basis, having due regard for all of the evidence, and if that evidence indicates that the values given by the petitioner's witness are too high and the values given by the respondent's witnesses are too low, we must determine whatever intermediate value the evidence supports. *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259. Absolute certainty is, of course, impossible. The Board must make as close an approximation as it can. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540.

The petitioner has apparently risked its case principally upon the opinion of its one witness, Little, and the theory of valuation which he adopted. That theory is that the value of any unsold lot or burial space in the cemetery on March 1, 1913, was the same as the amount which the cemetery was obtaining on or about March 1, 1913, from the sale or disposition of comparable lots or burial space. It argues that this method of valuation has been approved by the Supreme Court as the proper method of valuing cemetery lots as of March 1, 1913, and, further, that the Supreme Court has disapproved of methods whereby the selling price of comparable lots at the basic date would be discounted on account of the years required to sell the remaining lots or for any other reason. It cites in support of this argument the decision of the Supreme Court in the case of *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U. S. 37; reversing the decision of the Seventh Circuit in the same case reported at 83 Fed. (2d) 4, which had reversed a memorandum opinion of the Board, and the case of *Fairmount Cemetery Association* v. *Helvering*, 92 Fed. (2d) 496, which reversed a memorandum opinion of the Board.

We disagree with the taxpayer's interpretation of the decision of the Supreme Court in the *Elmhurst* case. The Circuit Court was reversed because it substituted its judgment concerning facts for that of the Board, where there was substantial evidence to support the Board's finding of fact. *Palmer* v. *Commissioner*, 302 U. S. 63; dissenting opinion in *Bogardus* v. *Commissioner*, 302 U. S. 34. The Board in the *Elmhurst* case found the value as contended for by the petitioner, which was based upon sales of other lots just prior to March 1, 1913. It is one thing to say, as the Supreme Court did, that such evidence was substantial, but quite another thing to say, as the Court did not, that no other factors may be considered as bearing upon the question of value, or that the value to be found in all cases is the amount for which other comparable lots were selling on or about the basic date. If the Court of Appeals for the District of Columbia interpreted the

*Elmhurst* case differently in *Fairmount Cemetery Association, supra,* then we respectfully disagree with that court, which recognized in its prior opinion in the same proceeding (79 Fed. (2d) 163), that "it is reasonable and fair to give consideration to the time element—the period of holding before a market can be had." The time element must be applied to the whole, not to the particular lots involved in sales in any particular year, since the basis can not change from year to year. *Reinecke* v. *Spalding,* 280 U. S. 227.

The witness, Little, upon whose opinion the petitioner relies, had been in charge of the affairs of the cemetery for a great many years. He is a stockholder and an officer of the corporation. He was familiar with the cemetery, with the relative attractiveness of the various sections, and with the sales made. He was a well informed cemetery executive. Although he is interested in the outcome of this case, we do not question his integrity. He gave his opinion of the fair market value on March 1, 1913, of a representative square foot of land in each section from which space had been sold during 1930 or 1931 and from which there had been sales made prior to March 1, 1913. He also gave his opinion of the fair market value of a representative square foot in the other sections from which sales were made in 1930 or 1931, but from which no space had been sold up to March 1, 1913. He arrived at his opinion as to the latter sections by comparing the land in each of those sections with the land in other sections from which sales had been made prior to March 1, 1913. He considered the prices which the petitioner was obtaining for burial space on or about March 1, 1913, and determined the amount per square foot which was being obtained in those sales for land in each section which he thought was fairly representative of all of the land in that section, and then stated that, in his opinion, the fair market value per square foot of all of the remaining land in any particular section was the same as the price determined for a representative square foot in that section. Thus his value for any section could be obtained by multiplying the number of remaining square feet in that section by the value which he gave for a representative square foot.

Frequently sales of similar or comparable property on or about the basic date are regarded as the best evidence of the value of the property in question. However, if that be the general rule, there are exceptions to it. *Bennett Gravel Co.,* 10 B. T. A. 513; *Alfred A. Wheeler,* 11 B. T. A. 579; *Gould Paper Co.,* 26 B. T. A. 560, 576; *H. D. Shelden,* 25 B. T. A. 5; *Cape Henry Syndicate,* 30 B. T. A. 794. The cases cited above involved the valuation as of the basic date of a large number of units which brought their owners no return until they were sold. Due to the limited demand, one could reasonably anticipate on March 1, 1913, that a considerable period of time would elapse before the retail price could be realized on all of the units. They had

to be marketed and the risks of the business had to be assumed. The method of valuation whereby the value of the whole was determined simply by multiplying the current retail price by the number of units was rejected. It confused the total amount of gross sales, ultimately expected, with present fair market value as of March 1, 1913, and overlooked other important factors.[1]

The method of valuation urged by the petitioner here and used by its main witness is substantially the same as that which was unsatisfactory in the cases just cited. This petitioner had on hand on March 1, 1913, a large supply of land which it was holding for sale as burial space. There was a limited demand for burial space, and any reasonable person on March 1, 1913, would have foreseen that, in all probability, the space could not all be disposed of until many years had passed. The unsold portions of the cemetery would not carry themselves, i. e., until the petitioner could get its money out of its investment through sales, it would not receive any return on its investment. Instead, expenditures of one kind or another would have to be made by the petitioner. The cemetery would have to be maintained and sales expense would have to be paid. This discussion should not be read as indicating that the current retail prices as of the basic date for similar properties have no evidentiary value. Such sales are substantial evidence, as the Supreme Court said in the *Elmhurst* case, but they must be considered as parties negotiating for the purchase and sale of all of the space available on March 1, 1913, would consider them. Fair market value has been defined as the price at which property might be expected to change hands between a willing buyer and a willing seller where neither is under any compulsion. Each of these parties would consider the favorable as well as the unfavorable factors. They would consider not only the current retail price being obtained for space in the cemetery, but many other factors such as the demand for space, the probable delay which might be expected in selling all of the property and in receiving the purchase price for that property, the risk, the selling expenses, and any other expenditures which might have to be made. They might compare the probable return on this investment with the return which might reasonably be expected with no greater risk if a like amount of money were used for some other purpose. In short they would consider all of the factors having any bearing upon the value, and they might be expected to agree upon the amount that the property as a whole was worth. The willing purchaser must have some prospect of profits to compensate him for the use of his money, time, and efforts, and for the assumption of the risk involved. The petitioner, in attempting to fix the retail sales price as the fair

---

[1] It would also prepare the way for a double deduction, since it would not eliminate from the basis the cost of sales which is separately deductible.

market value of the property, does not give due consideration to the necessary process of realizing those retail prices. Obviously, a purchaser of what the petitioner had on March 1, 1913, would not pay on that basis. The case of *Stern* v. *Paper*, 183 Fed. 228, involved the value of a stock of clothing owned by a retail dealer. The court held that the term "fair valuation", as used in the Bankruptcy Act, did not mean the retail price that could be realized in the slow process of trade involving large expenses and many risks. The same may be said in regard to "fair market value" as used in section 113 of the revenue act.

If all of the available burial space in the cemetery as of March 1, 1913, were valued, by using the figures given by the petitioner's witness and supplementing them with comparable figures for the sections which he did not value, the result would be a value of about $6,000,000.[2] Yet it is utterly ridiculous to suppose that the space could have been sold for as much as $5,000,000 in 1913. An investor with $5,000,000 to invest might have compared his probable returns from an investment in the cemetery with the return which he might reasonably have expected from an investment of his money in some other way which involved no greater risk. His annual income would have been $200,000 had he invested his money in safe investments at 4 percent. Cf. *Simpson* v. *United States*, 252 U. S. 547. The annual income of the petitioner from all sources as shown by its books was rather insignificant in comparison[3]—1912, $16,710.37; 1913, $12,864.71; best year, 1928, $85,074.68; average 1913 to 1936, inclusive, less than $41,000. The record does not indicate that the actual book earnings subsequent to March 1, 1913, were less than might have been reasonably anticipated on March 1, 1913. Prospective earnings, of course, furnish but one test of value, yet here that test demonstrates rather conclusively that the values placed upon the property by the petitioner's witness were grossly excessive. Furthermore, the evidence in this case otherwise demonstrates the excessiveness of his valuation. Thus, not only was his method faulty, but his result was wrong.

The respondent argues with considerable force that the amount which the petitioner received in its so-called sales of lots included,

---

[2] The figure of $6,000,000 is but an approximation. The record does not show exactly how much burial space the petitioner had in the cemetery on March 1, 1913, but a reasonably accurate computation can be made. The witness did not give values for some of the sections and values had to be assigned to those sections comparable to the values which the witness gave for other comparable sections.

[3] The record shows that the petitioner's gross income from sources other than the sale of land was at least equal to its gross income from sales of land, and the Commissioner argues that the earnings from other sources should not be considered as having any effect upon the value of the land. We think, however, that the willing buyer and the willing seller would consider the possibility of those additional earnings and the effect of that circumstance upon the value of the land. See, however, *Gatliff Coal Co.*, 8 B. T. A. 726; affd., 86 Fed. (2d) 545.

in addition to the amount paid for the land alone, an amount which the petitioner had to collect at that time for the future services which it would be required to render. Although the granting of the burial privilege exhausts the petitioner's direct source of income from the land, the petitioner obligates itself to furnish certain things in the future, as its witness, Little, stated. For example, it must continue to keep up the roads, walks, drains, fences, essential buildings, landscaping, and at least a part of the cemetery organization. The Commissioner points out that some, or all, of those expenditures would have to be made regardless of whether or not a separate amount was paid for perpetual care of the lot. The expenditures are not the same as those to be paid from the perpetual care income. Apparently the price of a lot at March 1, 1913, was the same whether or not the purchaser entered into a separate contract for perpetual care. The Commissioner argues that the petitioner well knew that it would be paid but once and would have to recover in that payment, not only a fair price for the land, but, in addition, enough to compensate it for the expenditures which it would have to make later. Therefore, he says, the amounts which the petitioner was receiving on or about March 1, 1913, must be reduced to find even the current retail price of the land. The decision in the present case, however, need not and does not turn in any way upon this argument.

One witness for the respondent stated that, in his opinion, the value of the stock of the petitioner on March 1, 1913, was $300,000. The record does not show the amount of the liabilities, if any, of the petitioner on or about March 1, 1913. Apparently the witness assumed that it had no liabilities. The record shows that it had depreciable assets on March 1, 1913, including buildings, fences, gates, roads, sewers, and some other equipment. The petitioner had a right to recover, and apparently was recovering through depreciation, the fair market value as of March 1, 1913, of its depreciable assets. If the value of the capital stock and the amount of the liabilities were known, the value of the depreciable assets might be deducted and the value of the land determined. The land and the improvements, however, had cost the petitioner far more than $300,000 prior to March 1, 1913, only a small part of the burial space had been disposed of up to March 1, 1913, land values were increasing, and there is no doubt that the fair market value of the remaining space was far greater than the value attributed by this witness to the entire cemetery properties of the petitioner.

The other witness for the respondent, who expressed an opinion of value, was a theorist. He had had no experience in or special knowledge of sales of comparable properties. His method was to examine the records of the petitioner showing sales, expenses, earnings, and other details of the business to anticipate the profits which might

reasonably be expected in future years, and, by means of a formula, to reduce those future profits to their present worth as of March 1, 1913. Earnings are frequently an important aid in determining values. A formula need not be cast aside merely because it is a formula. It may be helpful, if there is evidence showing its applicability and the proper factors to be used. The same may be said of various discount methods. But in the present case we are unable to say from the demonstration made by this witness that the values determined by him may be safely relied upon as the actual fair market values as of March 1, 1913. There is also evidence of the purchase price brought by nearby vacant land at times somewhat remote from March 1, 1913. This latter evidence is not very helpful.

The decision in this case is difficult because the parties have failed to introduce the testimony of well informed and sound witnesses on valuation. However, the evidence in the case, including records of sales, expenses, earnings, dividends, and other information, is such that the Board must render a decision no matter how great the difficulty. Like a jury, it must render its decision on the evidence. It has used its best judgment to fix a reasonable figure within the bounds of the evidence, fully conscious that others may differ and that some forceful objections to its determination may logically be made from the evidence. But the same would be true no matter what the determination of the Board.

In determining the proper amount to be used as a basis in 1930 and 1931 for reducing the amount realized in order to arrive at the net income from the transactions, we have also determined a value for the entire unsold burial space as of March 1, 1913. We have considered the methods suggested for allocating a portion of that basis to the various subdivisions. The primary contention of the petitioner, of course, has been that the Board should follow the opinion of its witness and determine directly a certain value for a representative square foot of ground in each section in which sales were made in the taxable years. The Commissioner, on the other hand, has merely divided the cemetery into improved and unimproved land. Our computations indicate that the method urged by the Commissioner will give the petitioner a slightly larger deduction for each year than would be obtained by dividing the total value among the various sections in proportion to their relative values as indicated by the petitioner's witness. Therefore, we have followed the Commissioner's method in checking our figures for the areas sold. The final amounts which we have determined for the two years are given in round figures. This is partly because we realize that our computations are at best not accurate and the few odd dollars, one way or the other, are much less than the probable percentage of error to which any determination or computation which we could make would be subject. We have not made the

value which we have determined for the entire available burial space as of March 1, 1913, a part of our findings. One reason for that deliberate omission is that such a finding is not necessary, since the case is determined, not by the total basis, but by the part applicable to the area sold in 1930 and 1931.

The record shows that between March 1, 1913, and December 31, 1931, the petitioner expended $28,242.57 for land improvements, exclusive of sewers and roads. The petitioner claims that 10 percent of these expenditures should be allowed as a further reduction of the amount realized from the sales made in 1931. A witness stated that he thought 10 percent would be a proper amount to allocate to the year 1931, but he did not give satisfactory reasons for his opinion. It does not appear just what portion of the cemetery benefited by the improvements in question or that the lots sold in either of these years represented 10 percent of that area. The record does not show whether or not any part of the $28,242.57 expended for land improvements was charged off as an expense in prior years. If the record justified any increase of the basis on account of these expenditures, we would make some allocation, but, under the circumstances, the basis is not to be increased in this manner. Cf. *Firemen's Insurance Co.*, 30 B. T. A. 1004.

The only other issue in the case is whether or not the petitioner may deduct $1,163.06 from its income for 1931 as a debt ascertained to be worthless and charged off. This debt represented the unpaid interest on a mortgage which the petitioner had accrued for the years 1928, 1929, and 1930. The record does not show that this debt became worthless in 1931. It does not show what information the petitioner had when it charged off the debt. It shows that the property itself was not worth the face amount of the mortgage some years after the close of 1931. Obviously, a taxpayer has to make a better showing than is made in this case before the Board can reverse the Commissioner's disallowance of a bad debt item.

*Decision will be entered under Rule 50.*