The Oak Woods Cemetery Association, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 77321, 80932.    Promulgated July 20, 1938.

*Paul E. Shorb, Esq.,* and *John A. Stolp, C. P. A.,* for the petitioner.

*W. R. Lansford, Esq.,* and *E. L. Weber, Esq.,* for the respondent.

126

128

**132**

LEECH: In its returns for 1931 and 1932, petitioner, using values of $1.50, $1.60, $2 and $3, depending on the section or subsection from which sold, reduced the amounts received from the sale of burial spaces by $49,247.91 and $43,586.16, respectively, as representing the fair market value on March 1, 1913, of space sold in the two taxable years. The respondent, in determining the deficiencies, allowed much smaller reductions, $5,036.26 for 1931 and $4,448.83 for 1932, computing them on the basis of 23 cents per square foot and on smaller amounts of footage than were actually sold by the petitioner and used by it in its returns. He made no allowance for interior wastage. We have found as a fact that the proper amounts to be used as bases in reducing the amount realized in the taxable years are $9,926.19 for 1931 and $8,676.09 for 1932.

The respondent has cited a number of cases which hold that a cemetery company does not dispose of the fee simple title to its land and the purchaser of a lot does not acquire a fee simple title but merely a license or easement to use the land for burial purposes. However, it is apparent that the purchaser of a cemetery lot does acquire a property right in the lot which the law recognizes, which can pass to his heirs or representatives at his death, and which may be enjoyed as long as the ground continues to be used as a cemetery. *People ex rel. Paxton* v. *Bloomington Cemetery Association*, 353 Ill. 534; 187 N. E. 455; *Brown* v. *Hill*, 284 Ill. 286; *McWhirter* v. *Newell*, 200 Ill. 583; *Mount Hope Cemetery Association* v. *New Mount Hope Cemetery Association*, 246 Ill. 416; *Community Mausoleum Co.*, 33 B. T. A. 19. The respondent agrees that the amount which the petitioner received during the taxable years may be reduced by a basis in order to determine the portion of it that represents taxable income, even though the fee was not sold. Cf. *International Cigar Machinery Co.*, 36 B. T. A. 124; *William Robert Farmer*, 1 B. T. A. 711. Neither party has presented any argument showing that the basis should be different from that part of the fair market value on March 1, 1913, of the unsold land itself, which is allocable to the lots or burial rights sold in the taxable years.

Section 113 of the Revenue Acts of 1928 and 1932, which are controlling here, provides that the basis for gain or loss from the sale or other disposition of property acquired prior to March 1, 1913, shall be the cost of such property or its fair market value as of March 1, 1913, whichever is greater. The purpose of the provision was to permit a taxpayer to recover his capital investment tax free. Cf. *United States* v. *Ludey*, 274 U. S. 295. During 1931 and 1932, the petitioner sold burial space in its cemetery, which space was a part of the land owned and held by it for such use on March 1, 1913. The only property involved in these profitable transactions which had any basis for gain or loss was the land. *Mount Hope Cemetery Association*, 37 B. T. A. 671. The petitioner's basis for gain or loss upon the disposition of that remaining burial space in its cemetery was the cost of the land, including improvements, or the fair market value on March 1, 1913, whichever was greater. No contention having been made by either party that the cost on the basic date was in excess of the fair market value and the proceedings having been presented on the theory that it was not, we conclude that the fair market value on March 1, 1913, was greater than cost. Consequently, the basis which petitioner is entitled to deduct before any excess realized from the disposition of burial space is taxed, is the fair market value of the land on March 1, 1913.

The total basis which the petitioner was entitled to recover from the disposition of its burial space after March 1, 1913, was the same amount, irrespective of whether the entire area was sold in one transaction or whether sold in separate parcels over a long period of years. After the entire area is sold the total of the bases for space sold in the various years should be identical with the value of the unsold area on the basic date. Therefore, the aggregate of the bases for all of the separate burial space can not exceed the fair market value on March 1, 1913, of the unsold area on that date, considered as a whole. Cf. *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312; *James Couzens*, 11 B. T. A. 1040, 1161. It is thus immaterial whether the basis applicable to space sold in 1931 and 1932 be determined directly or whether the value of the entire unsold area on the basic date be determined first and an allocation then made to the space sold in these years. Cf. *Trustees of New York & Brooklyn Bridge* v. *Clark*, 137 N. Y. 95; 32 N. E. 1054.

In determining value the inquiry should be as broad as possible, with consideration being given to all pertinent, available information. The record before us contains opinion testimony of values by witnesses for both petitioner and respondent. It also contains a stipulation of facts, together with documentary evidence. After giving full consideration to all of this evidence, it is our duty to determine a

basis. If such evidence indicates that the values given by petitioner's witnesses are too high and those given by respondent's witnesses are too low, it is incumbent on us to determine an intermediate value which the evidence supports. *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259. Although absolute certainty is impossible, we must make as close an approximation as possible. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540; *Doric Apartment Co.*, 32 B. T. A. 1187; affd., 94 Fed. (2d) 895.

The petitioner contends that the fair market value of its unsold cemetery lands on March 1, 1913, was at least $2 per square foot. The alternative argument is made that the values of $1.50, $1.60, $2, and $3 per square foot, depending upon the sections or subsections involved, used in its returns for the years in controversy, were correct. Although in determining the deficiencies, respondent used a value of 23 cents per square foot on the basic date, he now asks us to find that such value was not in excess of 30 cents per square foot.

In support of the principal and alternative values for which petitioner contends, it relies on sales of burial space on or about the basic date, the offer of the National Construction Co. in 1912, the opinion testimony of its president and two other cemetery men, and the appraisal made by Howell and Rudd about 1920.

Actual sales of similar property, occurring on or about the basic date, are substantial evidence of value, here. *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U. S. 37; *Fairmount Cemetery Association* v. *Helvering*, 92 Fed. (2d) 496; *West View Cemetery Association* v. *Commissioner*, 95 Fed. (2d) 714. We do not, however, understand the *Elmhurst* case to require that the value in all cases is the amount for which other comparable burial space was selling on the basic date. *Mount Hope Cemetery Association, supra.* If the court in the *Fairmount Cemetery Association* or *West View Cemetery Association* cases interpreted the *Elmhurst* case differently, we respectfully disagree. The court in the *Fairmount* case specifically recognized that "it is reasonable and fair to give consideration to the time element— the period of holding before a market can be had." The time element is applicable to the whole and not to the lots involved in any particular year, since there can not be a change in the basis from year to year. *Reinecke* v. *Spalding*, 280 U. S. 227. In this connection it is to be observed that in no year prior to 1913 had the average selling price of burial spaces per square foot approximated the values for which petitioner contends; that in 1913 the average selling price was only $1.3942 per square foot; that it was not until 1920 that it reached $1.50, and not until 1924 that it reached $2.

Petitioner's president, Farwell, an experienced Chicago cemetery man and familiar with the land and selling prices on the basic date,

was of the opinion that the unsold burial space had a fair market value of $2 per square foot on that date. In forming that opinion he made no allowance for the period of time it would have to be held before being sold for burial space. His opinion was that no such allowance was warranted because of the increase in value. He admitted that the cost of selling the land at $2 a square foot on the basic date would have been "considerable" but failed to state what he thought such cost would have been. He mentioned no basis upon which it could be estimated. He further stated that his opinion was, to a great extent, based on a desire to find an easier method of computing allowances for value than by using different values for different parts of the land, and the further premise that he did not know what the future of the property would be. Another witness for petitioner, Johnson, who was president of another cemetery in the Chicago area and familiar with petitioner's property on March 1, 1913, valued the burial space at $1.60 to $1.70 a square foot on the basic date. His opinion was based on what he considered was the established fair retail selling price of the ground. Another witness for petitioner, Schrade, who is on the board of directors of another cemetery in the Chicago area and was familiar with petitioner's unsold lands at March 1, 1913, was of the opinion that the value was $1.75 a square foot. He thought that such amount was the average selling price per square foot received by petitioner for space sold about the basic date. Having that in mind and his own judgment of the fair value of the land, he reached the opinion expressed. He gave no consideration to selling cost or future operating costs of the cemetery. The record is not clear as to how Howell and Rudd arrived at the values used in their appraisal. It shows, however, that consideration was given to retail selling prices of burial space, but what weight was accorded them is not disclosed.

The testimony of petitioner's president indicates that the value to which he testified is subject to a considerable reduction, if for no other reason, because it does not reflect the cost that would have been required to have sold the land on the basic date. The opinions of petitioner's witnesses Johnson and Schrade were based on what they considered to be retail selling prices. Often sales of comparable property on or about the basic date are regarded as the best evidence of the value of the property in dispute. However, there are many situations where that is not true. Among these are cases involving a large number of units which produce no income until sold and which, due to a limited demand therefor, could not, reasonably, have been expected on the basic date to be entirely disposed of until the expiration of a considerable period during which time the risks of business had to be assumed. The reason the current retail price is not determinative in valuing the whole number of units in such situations is that such a

**136**

rule would confuse the total amount of gross sales, ultimately expected, with the fair market value on the basic date. *Bennett Gravel Co.*, 10 B. T. A. 513; *Alfred A. Wheeler*, 11 B. T. A. 579; *Gould Paper Co.*, 26 B. T. A. 560, 576; *H. D. Shelden*, 25 B. T. A. 5; *Cape Henry Syndicate*, 30 B. T. A. 794; *Mount Hope Cemetery Association*, *supra*.

On March 1, 1913, the petitioner had a large amount of land which it was holding for sale as burial space. There was not only a limited demand for this space but there was a large available supply of it in the Chicago area. Any reasonable person on March 1, 1913, would have foreseen that, in all probability, all of the space could not be disposed of until the lapse of a long period of years. Considering the space sold during the entire period from 1865 to the basic date, about 35 years more would have been required within which to dispose of all of petitioner's salable land. On the basis of sales during the five-year period immediately preceding 1913, about 55 years in addition would have been required. The unsold portions would not carry themselves and petitioner would get no return on its investment until the land was sold. Expenditures of various kinds would be required and some expense would be incurred in making sales.

Fair market value is the price at which any property would change hands between a willing buyer and a willing seller where neither is under any compulsion. Each of the parties would consider the various factors involved, including the current retail selling price of burial space, the demand for and available supply of space in the area, the probable delay in disposing of all the property and receiving the purchase price therefor; the risk to be assumed, and selling and other expenses involved prior to a disposition of the property. They would probably consider the return obtainable from the use of a like amount of money in a different kind of investment which entailed no greater risk. A willing purchaser would demand some prospect of profits to compensate him for the use of his money, his time, and his efforts, as well as for assuming the risk involved. Values based on retail selling prices do not give proper consideration to the matters involved in a realization of such prices. Cf. *Stern* v. *Paper*, 183 Fed. 228.

On the basic date, petitioner had 2,453,916.78 square feet of salable burial space, exclusive of applicable interior wastage. Applying the highest values stated by its witnesses, $2, and the lowest, $1.60, to the salable footage, results in aggregate values of $4,907,833.56 and $3,926,268.85. The record discloses an annual return on petitioner's perpetual care fund investments of between 5 and 6 percent. However, dropping to 4 percent as a return on safe investments, an investor's annual income on the foregoing amounts would have been $196,313.34 and $157,050.75, respectively. Cf. *Simpson* v. *United States*, 252 U. S. 547. In no year was petitioner's annual net income

from all sources even comparable to the lower of those amounts. Its income of $85,074.15 for 1892, the highest annual return shown by the record, exceeded, only slightly, one-half of the lower of such amounts and its average annual net income of $58,056.94 for the period 1881 through 1913 was less than one-half. Its income of $50,247.48 for 1912 and income of $53,236.17 for 1913 were each only about one-third of the lower amount. And, for most of the years following 1913 when petitioner's income from the sale of burial space was reported after deducting March 1, 1913, values thereof somewhat comparable to the values petitioner's witnesses state here, the annual net income was decidedly lower. If it be assumed that the net income reported in petitioner's returns for the period following the basic date through 1932 was understated and that all dividends, totaling $930,000, paid during that period were entirely from earnings and represented its income for the period, then the average annual income was only $48,947.37, which is even more unfavorable than the results of operations prior to March 1, 1913.[2] While past and prospective earnings afford but one test of value, they show here quite conclusively that the values expressed by petitioner's witnesses were grossly excessive. In our opinion the evidence as a whole shows that such values were greatly in excess of that contemplated by the term fair market value.

What has been said above is applicable to petitioner's alternative contention respecting values of $1.50 to $3 per square foot for burial space, dependent on the section from which sold, as used by it in its returns.

In support of its contention for a valuation of $2 per square foot petitioner relies on the offer of the National Construction Co. made in September 1912, for 50,000 square feet of land in one of the unsubdivided sections. The evidence clearly establishes that this was not an outright offer to buy at a stated price, but was a proposal to enter into business with petitioner with respect to the erection of a large mausoleum and the sale of burial space therein. It was an undertaking into which petitioner considered it was not prepared to enter because of the risk involved. The proposal therefore does not support the contention.

---

[2] The respondent contends that petitioner's earnings from other sources than the sale of burial space should not be considered as having any effect on the value of the land on the basic date. Since the income from other sources involved the use of assets other than the land, the value of which is here being determined, there is merit in the contention. *Gatliff Coal Co.*, 8 B. T. A. 726; affd., 36 Fed. (2d) 545; *Eli J. Taylor*, 9 B. T. A. 442. However, it is impossible from the evidence to make even an approximate segregation of the two classes of earnings prior to the basic date. Since it is our opinion that a willing buyer and a willing seller on the basic date would have given consideration to earnings from other sources prior to that time and their effect on the disputed land values, we have considered them in reaching our conclusion here of such value on March 1, 1913. See *Mount Hope Cemetery Association, supra.*

In this connection it is to be observed that if petitioner's cemetery land had the values on the basic date for which it now contends and if, as on petitioner's theory, such land was thereafter increasing in value, petitioner should reconcile these very substantial values with the relatively small values that it placed upon the land in its capital stock tax returns year after year. No such reconciliation is attempted and, we think, none can be made.

The respondent submitted the testimony of two witnesses respecting value, neither of whom was familiar with petitioner's property on the basic date. One witness, Thomas, who had been on the property a number of times shortly before the hearing, was of the opinion that petitioner's entire properties, as a unit, including its cemetery land, had a fair market value on the basic date of $987,500. He expressed no opinion as to the separate value of the land or the separate value of the other assets, nor did he furnish any basis for making an allocation of $987,500 between the land and the other properties. Since we are not called upon to determine the value of petitioner's other properties, in addition to the land, his opinion furnishes little assistance. Respondent's other witness, Lockwood, a Bureau engineer, expressed an opinion that the fair market value on the basic date was 30 cents per square foot. He had been on the property once. He had never been engaged in the cemetery business, had never bought or sold any cemetery lands, and knew of no sales of comparable properties around the basic date. The method used by him in reaching his opinion was to examine the data pertaining to petitioner's sales expenses, earnings, and other related matters. From them he estimated what the future profits over an estimated period of years would be and, by the application of certain discount factors, reduced such future profits to their present worth as of the basic date. Often earnings are of much assistance in determining value and formulae or discount methods may be helpful where the evidence indicates that they are applicable and show the proper factors to be used. From the showing made by the witness we are not prepared to say that the value to which he testified can be approved as the fair market value of the property on the basic date.

Considering all the evidence before us, we have concluded that the petitioner is entitled to the allowances for value of burial space on March 1, 1913, as set out in our findings of fact, which are limited to the value of that space sold in the taxable years. We realize that others might fix other amounts and that plausible objection to our determinations might be made. However, that would be true with any determination that might be made.

The stipulation submitted by the parties shows that there is included in the unsubdivided land on the basic date, certain footage

which would constitute interior wastage and would therefore be non-salable. In view of the fact that such footage was recognized by the parties as nonsalable, we have so recognized it in our determination of value which is made on the basis of the amount of net salable footage on the basic date as stipulated by the parties. Petitioner, who raised the issue as to an additional allowance for wastage, states on brief that it makes no contention for such an allowance where a valuation is made on the basis of net salable land. The issue therefore is decided adversely to petitioner. This opinion supersedes a memorandum opinion herein, entered May 2, 1938.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Tyson dissents.