ALFRED A. WHEELER, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6570. Promulgated April 13, 1928.

*Gregory A. Harrison, Esq.*, for the petitioner.
*Thomas P. Dudley, Jr., Esq.*, for the respondent.

580

OPINION.

VAN FOSSAN: From the record of this case and the brief of counsel for petitioner, it is not a little difficult to determine what figure is now contended for by petitioner as the March 1, 1913, value of his chromic iron ore deposit. On the witness stand petitioner asserted a value of $10 per ton for ore in the ground. That this figure was so unreasonable as to approach absurdity was apparent

from other evidence introduced by petitioner, notably the bulletin of the United States Geological Survey, in which it appears that the average price of ore delivered on the Eastern seaboard in 1913 was $10.12, and on the Pacific Coast $11.19. It is also seen in the fact that in November, 1917, when, due to the war, there was an abnormal demand for chromic iron ore, petitioner made a contract leasing the deposit at a rate of $5.50 per ton of concentrates, which he testified is many times more valuable than a ton of raw ore, and in the further fact that in 1918 petitioner claimed depletion of his ore deposit on the basis of a $2.50 per ton royalty.

That petitioner is not relying on this lay opinion and is not contending for a $10 value for ore in the ground is evidenced by his brief where he computes the value of the ore " when marketed " at $10 per ton. The evidence tends to support this value and for the purpose of this opinion it may be accepted as established.

The problem we have, however, is not the determination of the fair market price of delivered ore but the fair market value of the ore deposit in its natural state in 1913 long before operations were begun—two very different matters.

There being no direct evidence of the value of the ore in the ground other than the opinion of petitioner which we are obliged to ignore entirely, we look to the remainder of the record to ascertain if it is possible to break down the $10 figure for delivered ore into its component factors and thereby arrive at the value of the raw material in place. This is a difficult task at best.

Among the essential factors in determining market value are the existence of a demand and the accessibility of a market. Without a demand a rich natural resource may lie dormant and be commercially valueless. Create an active demand and the same deposit may find a ready market. The truth of this fact was demonstrated by the abnormal demand for this very product during the late war. Similarly, proximity to market may be a determining factor. Two deposits of ore, one in close proximity and the other far removed from the consuming market, will vary greatly in fair market value. In the instant case as to 1913 there is proof neither of a demand nor of an available market. The eastern steel district was the principal consuming market. But in the bulletin of the United States Geological Survey, above referred to, it is stated as a fact that due to the long railroad haul California ore could not compete in the eastern market with the cheaply delivered foreign ores. Petitioner was thus relegated to the California market, and there is no evidence of any demand in 1913 for chromic iron ore in California. The total production of the State in that year was but 255 tons valued at $2,854.

Furthermore, there is no evidence that petitioner's ore was of a quality that could compete with other ores, it appearing that the usual percentage of chromium oxide was 50 per cent, while petitioner's ore contained but 39.68 per cent.

We can attach no weight to the fact that in 1917 and 1918 petitioner was able to lease his ore at a high royalty rate. The evidence shows that during the war there was such a demand for chromic iron ore that it was profitable to operate any chromium mines in the state, regardless of location, a condition which had not previously existed. On the contrary, an inference might be drawn from the fact that this deposit lay undeveloped until 1917 when this abnormal demand with high prices arose that except for such condition petitioner might never have profitably marketed his ore.

The price of $10 or $11.19 per ton in 1913 for ore marketed presumably includes, in addition to the cost of the raw mineral, the cost of development, mine supplies, handling charges, local transportation, railroad freight, overhead, depreciation on plant, labor and profit. The evidence on such items is either wholly lacking or very incomplete and unsatisfactory. It seems to be a reasonable inference from the low chromic oxide content of petitioner's ore and the recital in the amended agreement of November, 1917, that a concentrating plant was essential to operation of this deposit. We have, however, no evidence of the cost of operating such a plant in 1913 or of the cost of the incidental buildings and other equipment.

Petitioner has not sustained the burden of proving that the determination of the respondent as to the valuation of the ore deposit was in error. *Judgment will be entered on 15 days' notice, under Rule 50.*