Milton A. Goetz and Marjorie R. Goetz v. Commissioner.
Goetz v. Commissioner
Docket No. 81728.
United States Tax Court
T.C. Memo 1962-168; 1962 Tax Ct. Memo LEXIS 141; 21 T.C.M. (CCH) 934; T.C.M. (RIA) 62168; July 16, 1962
*141 March 1, 1913, fair market value of iron ore deposit determined. James K. Polk, Esq., George J. Noumair, Esq., and Daniel F. Callahan, Esq., for the petitioners. Charles M. Greenspan, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1950 in the amount of $31,233.18. The sole issue for our determination is the March 1, 1913, fair market value of an iron ore deposit. Findings of Fact Milton A. Goetz (hereinafter referred to as petitioner) and Marjorie R. Goetz, husband and wife, filed a joint Federal income tax return for the year 1950 with the collector of internal revenue for the first district (Brooklyn) of New York. With the object of establishing an iron and steel industry in Canada, the Dominion Government, in 1884, began to pay a bounty of $1.50 per ton of iron produced by Canadian furnaces from domestic ore. The bounties were raised in 1898 to $3 per ton and the industry was stimulated thereby. Petitioner's father, Alois Goetz (hereinafter referred to as Alois), like many others during the turn of the century, prospected and staked *142 various iron ore properties in the Michipicoten area of Ontario, Canada. The Michipicoten area lies about 100 to 150 miles north of Sault Ste. Marie, Ontario, and is a rectangle of about 25 miles by 20 miles, the southwest corner of which borders on Michipicoten Harbor of Lake Superior. While there are various iron ore and mineral deposits in the Michipicoten area, the principal ores are found on a major range known as the Michipicoten Iron Range. This range contains large amounts of hematite, pyrite, and is the major known source of siderite in North America. The principal individual iron ore deposits on the Michipicoten Iron Range are called the "Ruth," "Helen," "New Helen," "Lucy," "Josephine," and "the Bartlett" (later named "the Britannia"). Also in the area is the "Magpie," which is an isolated ore body about nine miles from the Michipicoten iron range. The Helen was discovered in 1897 as a hematite property. In 1899 it commenced operations as a mine and the first shipments were made in 1900. The Helen hematite mine was owned by the Algoma Steel Corporation, Ltd., (hereinafter referred to as Algoma), the owner of most of the iron ore deposits in the area. Algoma was *143 a subsidiary of the Lake Superior Iron & Steel Company. This parent company, either directly or through subsidiaries, owned the second largest steel mill in Canada located in Sault Ste. Marie, Ontario, and also coal mines, iron ore mines, one of the two power plants in the Michipicoten area, and a railroad and steamship line connecting the mines with the Sault Ste. Marie steel mill. The Ruth deposit was discovered by Alois as a siderite property and title thereto was received by patents from the Crown dated July 30 and 31, 1908. While part of the deposit was originally deeded to his wife, Ruth, such part was subsequently transferred to Alois on April 22, 1909. While the original Ruth contained Claims Y454, Y455, KW41 and KW42, only the latter two claims and two fractional parts of the two former claims are in issue here. In performing the mining or assessment work necessary to obtain the patents, Alois or his employees systematically trenched the main ore body which outcropped on a high hill. These trenches, which were about 2 1/2 feet wide and up to 5 feet deep, were dug at short intervals across the width of the surface of the ore body. Also, the center of the ore body was *144 stripped of overburden for about 1800 feet across its length. The mining and assessment work exposed an ore body about one-half mile long, the main part of which was about 1600-1800 feet long, with a width of 200 feet in some places, but with an average width of 120-130 feet. All of the mining and assessment work was completed by 1908 when the patents were received, and, thereafter, no further work was done by Alois on the property. In addition to the trenching and stripping on the surface of the main ore body, a 45-foot tunnel was driven into the ore body 150 feet below the crest of the hill. Both the ceiling and floor of the tunnel were of siderite. From the surface on top of the hill to the level of the tunnel, Alois estimated the siderite deposit to be approximately 3,000,000 tons. The entire deposit, however, was believed to be even deeper, yielding one million tons per every 50 feet in depth. Hematite was never found in the Ruth. In addition to the iron ores in the Ruth, there was considerable timber on the surface consisting of spruce, balsam and white birch. The Algoma Central & Hudson Bay Railroad (an affiliate of Algoma) runs along the eastern end of the Ruth, such *145 line having been completed prior to March 1, 1913. The railroad connects the area with the Michipicoten harbor on Lake Superior, a distance of 21 miles. This harbor, in turn, is approximately 125 miles by boat from Sault Ste. Marie, Ontario. The Ruth, from the time that it was staked and prospected, and the mining or assessment work done prior to 1913, was not mined commercially nor was there any depletion with respect to it until January 12, 1950. The major source of iron ore in North America prior to 1913 was the hematite deposits of the Mesabi Range in the Lake Superior area of the United States. Hematite is a red oxide of iron containing approximately 60 percent iron in its natural state. It has been used as a direct shipping ore, i.e., it is used as a blast furnace feed in its natural state. Siderite, on the other hand, is a carbonate of iron which, in its natural state, contains only about 35 percent iron, with small amounts of moisture, silica, managanese, sulphur, lime, magnesia, phosphorus, alumina and arsenic. Because of its lower natural iron content and other impurities, siderite has never been used as a direct shipping ore in North America. Sintering processes were *146 known prior to 1913 which could raise the iron content and remove most of the impurities, but they were never attempted on a commercial scale. The Helen hematite was the only iron ore deposit which was mined in the area prior to 1913. While the existence of siderite deposits in the area had long been known, it was not until 1910 that any attention was focused on it. The iron ore mined in Ontario had to compete with the hematite mined in the Lake Superior region of the United States. Inasmuch as hematite was direct shipping ore, the added cost of sintering siderite would have kept it from being competitive. In 1910 Algoma owned many siderite deposits, including a large deposit called the New Helen. In that year it leased the Magpie, a siderite deposit isolated from the main range and located nine miles away from the area railroad. The Magpie venture was considered an experiment in the commercial feasibility of mining, sintering, and marketing siderite. Development work revealed a compact, easily accessible, fine quality siderite body of about 1400 feet long and 45 feet wide with a total estimated reserve of about 2,500,000 tons to a depth of 600 feet. The lease provided for a *147 royalty of 20 cents per ton of all ore shipped, with a minimum royalty of $10,000 per year. During 1910 an operating shaft was put down to a depth of 80 feet and building of a permanent village for employees was in progress. Arrangements were made to connect the Magpie with the railway, an affiliate of Algoma. Samples of the Magpie ore sent to the Detroit Chemical Works indicated that a commercial product with over 50 percent iron could be produced after the raw ore was sintered. Ten tons of raw ore would be necessary to produce seven tons of finished product. In June 1911, the lease was cancelled and the Magpie was purchased outright by Algoma for $250,000. By September 30, 1912, the total cost of the Magpie operation was $1,073,730. A single unit experimental plant for testing on a semi-commercial base was completed and put in operation in December 1912. This unit was operated until October 1913 when it was dismantled to be replaced by a plant designed along the lines suggested by the experience of the previous ten months. Shipments of ore from the Magpie during 1913 totaled 22,327 tons. From time to time the bounty paid by the Canadian Government was varied, and in 1912, *148 all forms of direct Government assistances were withdrawn. The additional costs of sintering siderite kept it from being freely competitive with the direct shipping of ore from the Lake Superior area in 1913. Less than two percent of the total ore shipping at that time was sintered siderite. While the iron content of the Magpie siderite after sintering was still lower than that of raw hematite, it contained about two percent manageaese (a desirable element) and about 12 percent lime and magnesia, which enabled it to be almost self-fluxing. In addition, it contained only two percent sulphur, an undesirable element found in many ores at that time. These elements rendered the Magpie siderite acceptable in the iron ore market. The new roasting plant at the Magpie went into operation in May, 1914, and was found to be successful in processing siderite. The Magpie was mined underground rather than with the open-pit method. The cost of operating the Helen hematite mine in 1913 was $2.80 per ton, excluding any provisions for a sinking fund. The record does not disclose which method was used to mine the Helen in 1913. Hematite is a softer ore than siderite. For underground mining, it *149 is more economical to mine siderite because less timber support is necessary. In open-pit mining, however, siderite is more expensive to mine than hematite. A 1923 report on the Helen hematite mine of the Iron Ore Committee of Ontario, stated, in part, as follows: An interesting, though unfortunate feature of this deposit was the presence in it of pockets of pyrite * * *. These pockets were not numerous on the first level, but on succeeding levels the pyritic zone increased in size, thus raising the sulphur content of the ore hoisted, and resulting in a large tonnage of ore having to be left unmined. * * * The process developed at the Magpie to sinter its siderite would not have worked for the Ruth siderite. The latter contained what was then considered an objectionably high sulphur content which could not be reduced sufficiently with such process. While there may have been other processes known at that time which were capable of lowering high sulphur content, none of them had yet been tried on a commercial scale. Subsequent to 1913, sintering processes were developed which not only lowered the sulphur content of siderite, but utilized it as a fuel, thus, making it a highly *150 desirable element. Approximately two-thirds of the Magpie ore was sold to its parent's steel mill at Sault Ste. Marie, and one-third was sold to outside parties. While Algoma continuously staked and purchased siderite deposits in the area until 1950, there is no evidence of any interest of Algoma in the Ruth. Alois also owned another iron ore deposit in the area, the Josephine, which was substantially a hematite deposit. The Josephine was optioned to Algoma in June 1913 and a lease was executed in 1914. Although the Josephone contained a small amount of siderite, Algoma only attempted to mine the hematite. Algoma ceased operations shortly thereafter. Between 1913 and 1916 Algoma drilled the New Helen siderite deposit. In 1917, while World War I was still in progress, the geologist in charge of the drilling operation concluded that mining the New Helen siderite could be profitable with the qualification that the war would continue. In 1918, Algoma, believing the war would continue, began developing the property and planning for a roast plant. All work ceased with the end of the war in 1918, and work was not resumed until 1938. Until 1921 iron ore in the area was not tested *151 for the presence of arsenic as its significance was not questioned. Subsequent studies had indicated that arsenic is objectionable as it affects the welding properties of the iron. In 1921, with the iron ore prices approaching pre-war (1913) levels, the Magpie was deemed no longer commercially feasible to operate and the mine and plant ceased production. The 1923 Report of the Iron Ore Committee of Ontario, in reporting upon the Magpie operations, stated, in part, as follows: At the time the process was adopted and installed, the Algoma Steel Corporation recognized that to keep within commercial limits, the capacity of each unit must be maintained at not less than 120 tones of finished product per day; that the fuel consumption must not exceed 250 pounds per ton of roasted ore; and that they must desulphurize the ore without raising the temperature to a point where the ore gets sticky and forms rings on the lining near the discharge end of the kiln. In 1915, with the plant operating under very favourable conditions, the coal consumption was 271 pounds per ton of finished ore. In 1916 and 1917, the figures were 294 and 292, respectively. A reduction was effected in 1918 and *152 1919, bringing the consumption to about 282 pounds. However, with post-war conditions affecting operations, and comparatively poor coal, the 1920 figure was 328 pounds. Moreover, the maximum continuous burden in the kiln was found to be about 23 tons and the maximum production per unit, 110 tons of finished product per day. Under these conditions, and with iron ore prices in 1921 approaching pre-war levels, this method of beneficiation was no longer feasible, and the mine and plant ceased production March 1st, 1921. Thus ended the one effort made to beneficiate Ontario iron ores that approached commercial success. Circumstances Favouring Magpie Operation In conclusion it must be noted, in fairness to similar attempts, that the Magpie mine enjoyed one big advantage in the fact that the owners of the mine were also operators of blast furnaces, and in a position, if necessary, to absorb practically the whole Magpie production. Only those who have studied this advantage can appreciate its value. Still another advantage in the single ownership of beneficiation plant and furnaces, is that the owner has access to actual furnace results, and is thus placed in a position to take commercial *153 advantage of the favourable features of their product. Sintering May Solve Problem at Magpie If by substituting the Greenawalt or the Dwight and Lloyd sintering system for the kilns, costs can be sufficiently reduced to permit beneficiated siderites to meet competition in the open market, such deposits as the New Helen offer genuine promise and are worthy of early and active development. * * *
The 1923 Report of the Iron Ore Committee of Ontario, discussing the cost of producing iron ore in Ontario, stated, in part, as follows: Considering the siderites, where the ratio is least, we see that to produce 7 tons of product acceptable to the blast furnace, the mine must produce 10 tons, and the beneficiation plant must treat 10 tons of raw ore, and this naturally adds to the cost. * * * Since in the history of beneficiating iron ores in Ontario the Algoma Steel Company's effort at Magpie more nearly approached commercial success, and because their experience is based upon the production of more than 1,000,000 tons of finished product, we can best centre our investigation of comparative costs on this class of ore. The estimated difference between
average U.S. operating mining cost
for natural ores and Algoma cost of
mining 1.3 tons of raw ore at the
Magpie mine to produce 1 ton of
finished product, was 89 cents in
favour of the U.S. mines. At the
Helen mine where there are 12,000,000
to 15,000,000 tons of raw ore above
the adit level and an ore body pre-
senting many working advantages
over the shaft mine at Magpie, it
has been carefully estimated that
this relative difference would be re-
duced to $0.66
Add estimated cost of sintering by
Dwight & Lloyd or Greenawalt pro-
cess, per ton of sintered product
1.25
Excess cost of producing New Helen
sinter
$1.91
Deduct compensating advantages to
Ontario producers: Average royalty paid on the
U.S. side
$0.61
Average taxes paid on ore for
Ontario from the U.S.
.41
$1.02
Net advantage to U.S. mines per
ton of product
$0.89
*154 The average profit made by the United States iron producers in the Lake Superior district is approximately 80 cents per ton. If we deduct this amount from the 89 cents shown, it is apparent that our estimate shows a loss of 9 cents per ton of sinter produced at the New Helen mine. While the siderite in the Ruth was inferior to that of the Magpie, it was similar to that in the New Helen. Before any lease or purchase of an iron ore deposit, it was the custom in the industry for the prospective lessee or vendor to fully drill the property for its quantity and quality of iron ore rather than rely on visual estimates. In the early 1930's the Canadian siderite ore was still not able to compete favorably with the direct shipping ore of the United States. In an attempt to encourage the industry once again, Ontario offered to pay a bonus of one cent a unit on beneficiated iron ore. This once more stimulated interest in the siderite deposits of the Michipicoten area. Early in 1930 the Bethlehem Steel Company entered into negotiations with Alois with respect to the possible lease of the Ruth. In a letter dated February 12, 1930, from Alois to petitioner, he stated: Of course I do *155 not know whether a deal will be made but it looks favorable as their advance scout made a special trip here to see me. Of course you know that Ontario, has granted a bounty of 1 cent per unit of iron ore mined in Ontario. This bounty of course the steel company expects to be allowed to themselves, which I am willing that they should have. I am to know in two weeks whether a deal is possible. * * *
On April 21, 1930, prior to any agreement with Bethlehem, Alois transferred a 10/16th interest in the Ruth to petitioner. The deed provided for consideration to be paid by the "purchaser" in the amount of $3,000. At that time Alois was 72 years of age. Petitioner was 29 years of age and a recent law school graduate. Alois had previously requested petitioner to prepare some legal documents and perform some research for him. On May 3, 1930, Alois gave Bethlehem the right to conduct the first diamond drilling of the Ruth, plus an option to lease the property for a royalty of 25 cents per ton for roasted ore, and 50 cents per ton for direct shipping ore (in the event hematite was discovered) and a minimum royalty of $25,000 per year. A letter dated May 6, 1930, from Alois to petitioner, *156 stated, in part, as follows: As said before that I have given a drilling option with lease form attached on the Ruth. Before the paper was signed I had made a transfer of 10/16 interest on the Ruth to you dated April 22, but was asked not to record it until the already prepared option papers had been signed, which was done May 3rd, and on May 5th, I entered your transfer for recording it, but subject to the option papers, and you must be careful not to do anything which might leave us liable under the conditions covenanted in the option. * * *
The transfer of the interest to petitioner was recorded on May 8, 1930. Bethlehem drilled eight holes and did not exercise its option to lease the Ruth because their drilling indicated the ore body "pinched out" or came to a "necking point." In addition, they found objectionable amounts of arsenic in the ore. The 40th Annual Report of the Ontario Department of Mines, published in 1931, stated, in part, as follows: There has been renewed interest in both the iron ore and the pyrites deposits of the region during the past year. The bonus of one cent a unit on beneficiated iron ore granted by the Ontario legislature and a public sentiment *157 in favor of developing a domestic iron-mining industry have stimulated interest in the carbonate deposits of Michipicoten. The new Helen siderite deposit is unquestionably the most promising iron deposit for development at present in sight in Canada. The ore requires sintering, but the bonus, which will amount to about 50 cents a ton on the beneficiated ore, will help to defray the extra cost of beneficiation. That the mining and sintering of such an ore is regarded as an attractive commercial operation is indicated by the fact that the Bethlehem Steel Corporation last summer drilled the Ruth property on the Long Lake range in Michipicoten with the expectation of mining and sintering the siderite, even though the deposit was not expected to contain anything in ore reserves comparable in size to those of the Helen. The project unfortunately ended suddenly because the drilling showed that the siderite contained, in places, considerable arsenic and in addition the ore body was not as large as was anticipated from the surface exposure. Fortunately, it has been found on reinvestigation of the Helen siderite that it is free of arsenic in injurious quantities. Normal sintering will not remove *158 this element entirely and it is probable that it can be eliminated sufficiently for commercial purposes only by much more elaborate treatment entailing additional expense. It would have been a great national loss if the 100,000,000 or more tons of ore in the Helen had been found to contain injurious quantities of this element. It is hoped that arrangements may be made in the near future by the Algoma Steel Corporation, owners of this property, to operate the Helen mine as the operation of an iron mine would mean much to this part of the country. * * *
After the Bethlehem drillings, Alois did not deem the Ruth to be of any value and stated to petitioner that he was going to "let it go for taxes." Petitioner told his father that he would like to have it. By deed dated June 6, 1933, Alois transferred the remaining 6/16th interest to petitioner for the stated consideration of $1. Until 1938, the Helen hematite and the Magpie siderite were the only mines ever operated in the area. With the operations of both mines long ended, Algoma began to operate the New Helen siderite mine. Petitioner held the Ruth and Josephine mines until May 8, 1941, when he entered into an agreement with *159 the Frobisher Exploration Company, Limited, to lease the properties. The Ruth was leased for a period of 30 years with a royalty of 15 cents per ton, and on option to purchase for $134,437.50 in American dollars. The lessee did extensive diamond drillings on the Ruth which proved up 11,260,000 tons of marketable siderite. The analysis of the Ruth siderite then made, compared to an analysis of the Magpie siderite, is as follows: Ruth
Magpie
Percent
Percent
iron
34.54
35.61
phosphorus
.014
.01
silica
6.97
7.28
manganese
1.83
2.09
sulphur
6.107
2.00
lime, magnesia, alumina
8.44
12.00
The high sulphur content of the Ruth siderite was then considered to be a definite asset, as it reduced the amount of fuel required in the sintering process then in use. In addition, it was believed that the arsenic content could be lowered to permissible limits. In estimating the cost of placing the Ruth in operation, the company included the amount of $530,000 for "underground development and equipment." In May 1943, the option to lease the Ruth was exercised, and on January 12, 1950, the Ruth was purchased for $134,437.50 in American dollars. The Josephine *160 was sold also to the same company. Because of the shortage in equipment and the current scarcity of high-grade ore, the company first began operating the Josephine hematite mine. After a cave-in at the mine, the company suspended all operations and left the iron mining business. The Ruth had never been mined. In his Federal income tax return for the year 1950 petitioner stated that he received the Ruth property as a gift from his father; that such property, therefore, had the same basis as it would have in the hands of his father; and that inasmuch as his father acquired the property prior to March 1, 1913, his basis would be its fair market value as of March 1, 1913, under section 113(a)(14). Petitioner concluded that "As of March 1, 1913, it was fairly well established that mining claims KW41 and KW42 [Ruth] had considerable worth," and that "the price at which this property was sold [$134,437.50] would appear to be below its fair market value as of March 1, 1913, and, hence there is no capital gain. There would be no capital loss either, as the cost of staking and patenting the two claims was about $1,000 each, which is small compared to the selling price." In the deficiency *161 notice, respondent determined long-term capital gain on the sale of the Ruth as follows: Selling price
$134,437.50
Cost allowed
10,000.00
Long-term capital gain
$124,437.50
The fair market value of the Ruth mine as of March 1, 1913, was $56,300. Opinion Respondent maintains that petitioner had acquired the Ruth by purchase rather than by gift, and that his basis, therefore, is his cost. In the alternative, he contends that if the Ruth was acquired by gift, the basis, being its fair market value as of March 1, 1913, did not exceed $10,000. The sole ground for respondent's contention that petitioner purchased the property is the fact that the deeds transferring the interests in the Ruth provided for considerations of $3,000 and $1. Respondent does not, however, reconcile his determination of a $10,000 basis with his purchase theory. Petitioner contends that the determination by respondent of a $10,000 basis, with no explanation in the deficiency letter, clearly indicates an acquiescence on respondent's part that the property was received by gift, and that respondent was merely challenging petitioner's estimate of March 1, 1913, fair market value. Therefore, *162 petitioner argues, such value is the only issue properly before us. Since we hold, infra, that the Ruth was received by petitioner as a gift rather than by purchase, there is no occasion for us to determine whether respondent is limited as contended by petitioner. As to the first transfer of a 10/16th interest, while respondent does not contend that the $3,000 stated consideration was actually paid by petitioner, he argues that such amount was the "liquidated value" upon the legal services rendered by petitioner for his father, and that such amount was intended to be the full consideration for the property. Concerning the 6/16th interest, respondent contends that the consideration stated of $1 was intended to be the full consideration, inasmuch as Alois deemed the property to be worthless at that time. Petitioner testified that no consideration was ever paid, intended or bargained for concerning the transfers from his father, and that it was not until years later that he learned that consideration was even stated in the deeds. We have no reason to believe otherwise. Petitioner's father was 72 years of age at the time of the first transfer, and it is highly unlikely that any *163 consideration would have been asked or intended by him other than love and affection. In addition, the letter from Alois informing petitioner about the transfer of the 10/16th interest did not mention anything about consideration. We believe the situation here is similar to that presented in Sax Rohmer, 21 T.C. 1099 (1954), where we stated (p. 1103): Petitioner contends that this assignment was made as consideration for various professional and other services rendered by his wife in the writing of this novel, and that a gift resulted only to the extent that the value of the interest transferred exceeded the value of such services. However, we are unable to find, on the basis of this record, that these services were, in fact, given as consideration for the assignment of an interest in the novel rather than being in the nature of gratuitous services a wife will render in the aid of her husband's professional and business pursuits, whenever she may be of help. It is true that petitioner had followed a practice of dividing his income equally with his wife, but the evidence does not convince us that this was pursuant to an agreement requiring her to furnish consideration. *164 Consideration must be bargained for in order to support a contract and negative a gift; and "nothing can be treated as a consideration that is not intended as such by the parties." * * * Inasmuch as we believe that the Ruth was acquired by petitioner as a gift after December 31, 1920, the basis to petitioner would be the same as it would be in the hands of his father under section 113(a)(2), [1] I.R.C. 1939. Since his father acquired the property prior to March 1, 1913, the basis would be its fair market value as of that date, under section 113(a)(14), n.2 I.R.C. 1939. *165 The sole issue before us, then, is the fair market value of the Ruth as of March 1, 1913. Fair market value has often been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or to sell, and both having a reasonable knowledge of the relevant facts. Singer v. Shaughnessy, 198 F. 2d 178 (C.A. 2, 1952). The determination of the fair market value of iron ore deposits is difficult even if based upon contemporary values. The task becomes increasingly difficult as the valuation date recedes in point of time. Here, we are asked to determine the fair market value of a deposit as of 49 years ago. The respondent and petitioner are very far apart in their respective estimates. Respondent determined the value to have been $10,000, while petitioner contends its value to have been at least $134,435.50, the ultimate sales price of the property in 1950. The widely divergent estimates have been reached by wholly different estimates of tonnage and value per ton. Each party introduced expert testimony looking to estimation of the total tonnage of the Ruth as of March 1, 1913. Inasmuch *166 as neither of them were then familiar with the Ruth, nor had the Ruth been drilled up to that time, their estimates were based upon maps of the Ruth drawn by Alois prior to 1913. Petitioner's witness estimated the presence of at least five million tons, while respondent's witness estimated two million tons. We believe that both witnesses are incorrect in their methods of estimating tonnage. Tonnage as of March 1, 1913, must be determined in order to calculate what a hypothetical purchaser would have paid for the Ruth. It is one of the "relevant facts" which he is presumed to know in making his decision. Would a prospective purchaser have merely relied upon the maps drawn by Alois (as these witnesses have done) in estimating the tonnage of the ore? We think not. The record indicates that it was the custom and practice of a prospective purchaser to drill the property himself to find this figure. The first time the Ruth was drilled was in 1943 when 11,260,000 tons were proved. Since it is apparent that this tonnage was also present in 1913, and that it would have been discovered by a prospective buyer at that time, we must determine what such a buyer would have paid imputing this *167 knowledge of tonnage to him. See Northwestern States Portland Cement Co., 7 B.T.A. 835 (1927). The main dispute between the parties centers around the value per ton of the iron ore, regardless of the total tonnage. Respondent has determined the value as of March 1, 1913, to be one-half cent per ton. (Based upon his estimated tonnage of 2,000,000 tons, the total value was determined to be $10,000.) His determination of value per ton is presumptively correct and will not be disturbed unless petitioner produces affirmative evidence to upset it. New York Zinc Co., 27 B.T.A. 9 (1932). The record discloses that the Ruth deposit was held for lease or sale by Alois until 1930 before any buyer evidenced any interest in it. This fact, alone, does not mean that the Ruth was valueless. While both the statutory term "market value" and the usual definition imply the existence of a market, it has been held that the absence of a market does not automatically lead to the conclusion that there was no value. Publicker v. Commissioner, 206 F. 2d 250 (C.A. 3, 1953), affirming a Memorandum Opinion of this Court, certiorari denied 346 U.S. 924 (1954). *168 Nevertheless, there must be "some assurance that the value is what a 'market' would establish; and a 'market' itself presupposes enough competition between buyers and sellers to prevent the exigencies of an individual from being exploited. It may well imply that the goods have several possible buyers, so that a necessitous seller shall not be confined to one; and that there are several possible sellers of the same goods or their substantial equivalent, so that a hard-pressed buyer shall not have to accept the first offer." Helvering v. Walbridge, 70 F. 2d 683-684 (C.A. 2, 1934), affirming a Memorandum Opinion of this Court. While we must assume, therefore, that a hypothetical purchaser in 1913 would have purchased the Ruth, we must ascertain the price which he would be willing to pay. This price would depend upon the market and demand for the ore, the profitability of its use, present or prospective, actual and anticipated. Leland J. Allen, 5 T.C. 1232 (1945). Without a demand or ability to profitably market it, a rich natural resource may lie dormant and be commercially valueless. Alfred A. Wheeler, 11 B.T.A. 579 (1928). Whatever may have *169 been its intrinsic value, its market value would be inextricably interwoven with the conditions as they then existed. In an effort to spare us from the difficult task of valuing the Ruth as of March 1, 1913, by taking into consideration the aforementioned factors, petitioner maintains that we need look no further than the lease of the Magpie in 1910 for 20 cents per ton, and its sale in 1911 for $250,000. This price, he contends, is the best indication of the amount which a purchaser was willing to pay for a siderite deposit around 1913. Petitioner's one expert witness, who has been associated with Algoma since 1918, testified that the fair market value of the Ruth as of March 1, 1913, was approximately $350,000. This estimate was calculated by taking the assumed tonnage of five million tons and the royalty rate for the Magpie ore of 20 cents per sintered ton. Inasmuch as five million tons would yield 3,500,000 tons of sintered ore (10 to 7 ratio), at 20 cents per sintered ton, the total value would be $700,000. For a cash sale, he testified a buyer would pay about one-half, or $350,000. An expert's opinion is entitled to substantial weight only if it is supported by the facts. *170 Here the opinion is based entirely upon the assumption that the Magpie in 1911 and the Ruth in 1913 were equal in value. Absent the correctness of this assumption, the valuation would have little weight. The Magpie and the Ruth would be comparable in value only if (1) the market conditions as of March 1, 1913, were the same as they were in 1911, (2) the Magpie and the Ruth were comparable properties, and (3) the factors encouraging Algoma to believe that the Magpie was feasible to purchase and operate and, therefore, pay the price that it paid would have been available to our hypothetical purchaser of the Ruth. The determination of fair market value is largely a matter of judgment, and the various theories of valuation, such as the comparison with other properties, are useful only in so far as they suport a result that comports with sound judgment. The record discloses that the conditions of the iron and steel industry in Ontario, and in Canada in general, during the period around 1913 was not a healthy one. Canadian ore was not able to compete with the United States mined ore. In an effort to stimulate a domestic industry, the Canadian Government, beginning in 1884, offered to *171 pay a bounty on all Canadian iron produced. This stimulation may very well have encouraged Algoma's parent (which would receive the bounty) to have the Magpie purchased and mined. With the end of the bounty payments in 1912, the prospects of profitably mining Canadian ore thereafter would necessarily have been less favorable. Of greater significance is the question concerning the comparability of the Magpie with the Ruth. Would a hypothetical buyer have deemed both to be of equal value in 1913? Petitioner's expert witness, in comparing the two deposits, testified as follows: The Magpie is unquestionably a higher grade product, a higher grade ore body than the Ruth, but on the other hand, it is very much smaller and no open pit ore. It has to be shaft mining from the start. A railway nine miles long had to be built to connect it with the Michipicoten Branch, whereas the Ruth, while lower grade and would turn out a lower grade product, had as I estimated five million tons of open pit ore, it was right on the railway and of course a very much larger ore body, 1,600 feet long, and 130 feet wide, as compared to 1,400 feet long and 45 feet wide. Thus, the witness equated the values *172 of the two mines, deeming the admitted inferior quality of the Ruth siderite to have been counteracted by its larger size, its proximity to the railroad, and its capacity to be economically open-pit mined. Aside from the cost of mining, we cannot conclude that the Ruth was as commercially attractive or comparable in value to the Magpie. The Magpie contained a high grade siderite which could more easily be sintered to compete with hematite. It contained only two percent sulphur, an objectionable element, while it contained the beneficial ingredients of two percent manganese and 12 percent lime, magnesia and alumina, which were self-fluxing elements. The emphasis on the quality of the siderite can be seen from the fact that Algoma at the time it purchased the Magpie, already owned large siderite deposits in the area, including the New Helen. The fact that Algoma chose to operate the Magpie, which was isolated from the area, nine miles from the railway, and further away from the port, is a good indication that the quality of the Magpie was the crucial element in its determination. The New Helen (similar to the Ruth) owned by Algoma at that time was, apparently, not yet deemed feasible *173 for operation under the conditions then existing. Even in 1917, Algoma did not believe that the New Helen could be operated profitably unless the war continued. As late as 1923, it was still not believed able to compete with United States mined ore, and it was not until 1938, after the bounty payments were resumed, that the New Helen ever began operation. The Ruth contained over 6 percent sulphur, less than 2 percent manganese, and only 8.44 percent of the self-fluxing elements. The sulphur, a highly objectionable element in siderite at that time, could not have been eliminated even under the process developed at the Magpie in 1914. No processes were then yet attempted on a commercial scale to reduce so high a sulphur content. That portion of the Helen containing a high sulphur content was not even mined. We may not presume that our hypothetical purchaser would have been willing to expend large sums of money experimenting in processing inferior high sulphur siderite when other siderite was available, and the market for siderite, in general, was not encouraging. Any purchaser might have speculated that it would be of value sometime in the future, but its quality, the processes then *174 in existence and the market conditions would not have made the Ruth commercially attractive in 1913. Even the finer siderite of the Magpie could not compete effectively with the United States mined ore. We think it apparent that the Ruth siderite could not have competed at all at that time, but would only have been utilized after finer siderite deposits in the area were exhausted. Also of major importance is the determination of whether the factors encouraging Algoma to purchase the Magpie at their price would also be available to our hypothetical purchaser of the Ruth. Algoma had many advantages in its operation of the Magpie. It had a ready market, selling most of its ore to its parent company. It was also affiliated with a power plant in the area, and with the transportation facilities connecting the mines with the steel mill. As of March 1, 1913, there is no evidence of any local market for siderite other than that fulfilled by the Magpie. Assuming that the Ruth had a market in the area, and that a process could have been developed to eliminate the high sulphur content, we still do not believe that the Ruth could have been profitably operated in 1913. The record does not *175 disclose the pertinent 1913 figures necessary in order to calculate the profit or loss per ton. The parties are, however, in substantial agreement that the break even point per ton of Ruth ore mined was $1.79; that is, if the cost of mining each ton exceeded that figure, the operation would not have been profitable. The parties disagree upon the cost of mining the Ruth. The record indicates that it would have been necessary to use the underground method to operate it. The only cost of mining iron ore in 1913 is that of the Helen hematite, which was $2.80 per ton, F.O.B. mine, excluding any sinking fund provision. The record is not clear as to whether the Helen, in 1913, was mined using the openpit or the underground method. If this figure represented the cost of open-pit mining, it is clear that the Ruth, with a break even point of $1.79, would have lost money even though it could have been mined with this more economical method. Inasmuch as siderite is a harder ore than hematite, the cost of open-pitting siderite would have been greater than the cost of open-pitting hematite. On the other hand, if the $2.80 represents the cost of underground mining the Helen, the cost of mining *176 the Ruth would have been less. Because siderite is harder, it requires less timbering when mining underground. The record, however, does not disclose by what percentage we should reduce this figure. Assuming that the costs would be reduced by one-quarter, we would have a cost of $2.10 per ton, or a loss of 31 cents per ton. Based upon the above, we cannot see how the Ruth could have been considered by our hypothetical purchaser in 1913 to have been capable of production. While the profit or loss of the Magpie ore in 1913 was not in evidence, because of its many related affiliates, it had many economical advantages not available to others. We conclude that the most important of the "relevant facts" which we presume our hypothetical buyer to have known in 1913 is that the Ruth, unlike the Magpie, could not then have been commercially profitable to operate. The Magpie containing a superior quality of ore, and having many advantages in its operation which made it able to then be profitably operated, does not afford us with a basis for comparison of values. While ordinarily the value of an inferior product may be ascertained with reference to the known value of a superior product, this *177 cannot be done here. With the marginal conditions then existing in the iron ore industry, the difference in quality was the dividing line between a commercially valuable property and one that could not be profitably mined, thus widening the value differential substantially. The Magpie, then in a position of being commercially profitable, would necessarily be of greater value than the Ruth which then only had prospective value. The allowance for cost determined by respondent in his statutory notice was $10,000. It is apparent from the record that this allowance was based upon an estimate of 2,000,000 tons at one-half cent per ton. The record discloses, however, that the Ruth proved up to 11,260,000 tons of marketable siderite. Upon consideration of the record including all of the expert testimony, we accept the value of one-half cent per ton and determine a fair market value of the Ruth of $56,300 as of March 1, 1913. Fortunately for petitioner, two factors subsequently enabled him to ultimately command a sales price of $134,435.50 in 1950. First, improvements in beneficiating siderite utilized its high sulphur content as a fuel, making it a highly desirable element. Also, Ontario *178 began to pay a bounty in the 1930's on iron ore mined which stimulated the industry once more. The significance of these bounties can be seen from the fact that it was not until after the bounties were announced that Algoma began operating the New Helen siderite mine, and Bethlehem Steel Company became interested in the Ruth. Under these circumstances we cannot believe that the March 1, 1913, value could have approached or equaled the ultimate sales price in 1950 as petitioner maintains, but conclude, as above stated, that it then had a prospective value of $56,300. Decision will be entered under Rule 50. Footnotes
1. and n.2 SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(2) Gifts after December 31, 1920. - If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except that if such basis (adjusted for the period prior to the date of the gift as provided in subsection (b)) is greater than the fair market value of the property at the time of the gift, then for the purpose of determining loss the basis shall be such fair market value. If the facts necessary to determine the basis in the hands of the donor or the last preceding owner are unknown to the donee, the Commissioner shall, if possible, obtain such facts from such donor or last preceding owner, or any other person cognizant thereof. If the Commissioner finds it impossible to obtain such facts, the basis in the hands of such donor or last preceding owner shall be the fair market value of such property as found by the Commissioner as of the date or approximate date at which, according to the best information that the Commissioner is able to obtain, such property was acquired by such donor or last preceding owner. * * *
(14) Property acquired before March 1, 1913. - In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date. * * *↩